J-A24002-17

2017 PA Super 396

| IN RE: S.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.M. | |
| | No. 906 WDA 2016 |

Appeal from the Order May 25, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): 206 of 2014

BEFORE:  MOULTON, J., SOLANO, J., and MUSMANNO, J.

OPINION BY MOULTON, J.:                    **FILED DECEMBER 15, 2017**

S.M. appeals from the May 25, 2016 order entered in the Allegheny County Court of Common Pleas concluding that S.M. is severely mentally disabled and directing S.M. to remain involuntarily committed to an inpatient facility for 30 days, to be followed by 150 days of outpatient psychiatric treatment.  After a careful review of the record, we reverse.  While appellee Allegheny County ("County") cites to a history of conduct that might support the involuntary commitment at issue, little of that history is part of the record before this Court.  Because the record before us contains insufficient evidence to support the commitment, we reverse.

On May 25, 2016, S.M. was involuntarily recommitted to the care of the Western Psychiatric Institute and Clinic ("WPIC") and Pathways Long-Term Structured Residence ("Pathways").  This commitment was the latest

in a series of commitments that our review of the record suggests began on September 26, 2014, when S.M. was involuntarily committed to the care of the WPIC for 20 days under section 303 of the Mental Health Procedures Act ("MHPA"), 50 P.S. § 7303.[1]  On May 19, 2016, after S.M. had been involuntarily committed for almost 180 days under section 305 of the MHPA, a hearing was held at Pathways to determine whether S.M.'s involuntary commitment[2] should be extended under section 305.  At the end of that hearing, the presiding Mental Health Review Officer ("MHRO") recommended that S.M. be committed for another 180 days.  That same day, S.M. filed a petition for review of the MHRO's recommendation with the Court of Common Pleas of Allegheny County.

On May 25, 2016, the trial court held a *de novo* hearing, after which it ordered S.M. to receive another 180 days of involuntary treatment, with

_____

[1] Both S.M. and the County state that S.M. was involuntarily committed under section 302 of the MHPA on January 23, 2014.  However, as we later address, this section 302 commitment does not appear of record.  In fact, the only pre-September 2014 commitment order in the certified record is a February 14, 2014 order in which the trial court ordered S.M. involuntary committed for 90 days under section 304(b) of the MHPA.  We note our concern with the lack of information in the certified record, especially given the substantial deprivation of liberty associated with civil commitment orders.

[2] Because the petition is not contained in the certified record, we cannot determine who moved for S.M.'s continued involuntary commitment.

inpatient treatment not to exceed 30 days. On June 23, 2016, S.M. timely filed a notice of appeal.

The trial court explained the basis for its decision in an opinion filed pursuant to Pa.R.A.P. 1925(a), which provides in full:

> On May 19, 2016, a hearing was held before a . . . MHRO . . . who committed S.M. . . . pursuant to the provisions of **50 P.S. § 7305** for a period not to exceed 180 days. On May 19, 2016, [S.M.] petitioned the Court for a review of the MHRO's recommendation. On May 25, 2016, a hearing was held and the Court affirmed the MHRO's recommendation of the 180[-]day commitment. The Court further ordered in-patient treatment not to exceed 30 days effective May 25, 2016, to be follow by out-patient treatment. On June 23, 2016, a [n]otice of [a]ppeal was filed.
>
> At the hearing before the Court held on May 25, 2016, evidence was received that [S.M.] has a 20 year history of violent and aggressive behavior. In December of 2015, while living at a step-down mental health facility, [S.M.] stopped taking the majority of her medications resulting in her not sleeping for several nights in a row, not eating, and not taking care of herself. [S.M.] was also using racial slurs towards other residents of the facility creating an atmosphere of hostility and concern regarding retaliation from other residents.
>
> [S.M.] was then readmitted into [WPIC]'s acute care unit. On or about February 10-12, 2016, [S.M.] was discharged with the understanding that she would need to continue on her medications. [S.M.] did not continue with her medication and that resulted in the instant commitment.
>
> The Superior Court reviews determinations pursuant to the MHPA "to determine whether there is evidence in the record to justify the hearing court's findings." **In re T.T.**, 875 A.2d 1123, 1126 (Pa.Super. 2005), citing **Commonwealth ex rel. Gibson v. DiGiacinto**, 439 A.2d 105, 107 (Pa. 1981).

- 3 -

The Court in this matter conducted a hearing, reviewed the documents provided, listened to the recording of the hearing before the MHRO several times, considered the statements of [S.M.] at the review hearing, and weighed all the arguments made. Based on the aforementioned, the Court believes there was clear and convincing evidence presented in this case to affirm the MHRO order. [S.M.] has a 20 year history of violent and aggressive behavior, and was not taking her prescribed medication. Thus, she was, at a minimum, a danger to herself. Therefore, the Order entered by this Court should be **AFFIRMED**.

Opinion, 9/12/16, at 1-2 ("1925(a) Op.") (emphasis in original).

S.M. raises only one issue on appeal: "Was there insufficient evidence presented at the civil commitment hearing to support the Orphan[s'] Court's order of commitment?"[3] S.M.'s Br. at 4.

## I.  The Structure of the MHPA

The MHPA provides for involuntary emergency examination and treatment of persons who are "severally mentally disabled and in need of immediate treatment." 50 P.S. § 7301(a). It then authorizes increasingly long periods of commitment for such persons, balanced by increasing due

_____

[3] Although S.M.'s 180-day involuntary commitment calculated from May 25, 2016 presumably has ended, "the issues raised by this appeal are not moot since they are capable of repetition and may evade review." *In re Involuntary Commitment of Barbour*, 733 A.2d 1286, 1287 n.3 (Pa.Super. 1999); *see In re Woodside*, 699 A.2d 1293, 1296 (Pa.Super. 1997) (noting that expired commitment order presented a "live controversy despite the fact that appellant's commitment has long since expired. . . . 'because involuntary commitment affects an important liberty interest, and because by their nature most involuntary commitment orders expire before appellate review is possible'") (quoting *Commonwealth v. Blaker*, 446 A.2d 976, 977 n.1 (Pa.Super. 1981)).

process protections in recognition of the significant deprivations of liberty at stake. *See In re A.J.N.*, 144 A.3d 130, 137 (Pa.Super. 2016) (highlighting MHPA's purpose as "an enlightened legislative endeavor to strike a balance between the state's valid interest in imposing and providing mental health treatment and the individual patient's rights") (quoting *In re Hutchinson*, 454 A.2d 1008, 1010 (Pa. 1982)); *In re Ryan*, 784 A.2d 803, 807 (Pa.Super. 2001) ("The legislative policy reflected in the [MHPA] is to require that strict conditions be satisfied before a court order for commitment shall be issued. Such a policy is in accord with the recognition that commitment entails a massive deprivation of liberty.") (quoting *Commonwealth v. Hubert*, 430 A.2d 1160, 1162 (Pa. 1981)). Accordingly, "[i]n applying the [MHPA,] we must take a balanced approach and remain mindful of the patient's due process and liberty interests, while at the same time permitting the mental health system to provide proper treatment to those involuntarily committed to its care." *In re S.L.W.*, 698 A.2d 90, 94 (Pa.Super. 1997).

Under section 301(a):

> A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 P.S. § 7301(a). Section 301(b)(2) defines "clear and present danger" to oneself[4] as follows:

> Clear and present danger to himself shall be shown by establishing that within the past 30 days:
>
> (i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or
>
> (ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or
>
> (iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present

---

[4] Throughout the petition and review of S.M.'s May 19, 2016 commitment, the County has argued that S.M. is incapable of caring for herself, creating a danger of death or serious harm to herself under section 301(b)(2)(i) of the MHPA. In a footnote in its brief to this Court, the County does contend that her illness and inability to take care of herself "led her to exhibit paranoid and delusional behaviors that have severely impacted her quality of life and her ability to safely and civilly interact with others." *See* County's Br. at 22 n.4. Nevertheless, the County has not argued that S.M. is a clear and present danger to others under section 301(b)(1).

danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

*Id.* § 7301(b)(2).

Section 302 provides for emergency examination of persons, which

may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination.

*Id.* § 7302(a). Under section 302(b), a physician must examine the person "within two hours of arrival . . . to determine if the person is severely mentally disabled within the meaning of section 301 and in need of immediate treatment." *Id.* § 7302(b) (internal footnote omitted). If the physician so finds, then "treatment shall be begun immediately." *Id.* If not, then "the person shall be discharged and returned to such place as he may reasonably direct." *Id.* Section 302 allows a person to be committed up to 120 hours. *Id.* § 7302(d).

When a treatment "facility determines that the need for emergency treatment is likely to extend beyond 120 hours," section 303 provides that the facility may apply to have that involuntary commitment extended up to 20 days. *Id.* § 7303(a), (h). The facility files an application for such commitment with the court of common pleas, which then appoints an attorney for the person unless it appears "that the person can afford, and

desires to have, private representation." *Id.* § 7303(b). "Within 24 hours after the application is filed, an informal hearing shall be conducted by a judge or . . . [MHRO.]" *Id.* The court or MHRO must keep the record generated by these proceedings for at least one year. *Id.* § 7303(c)(2). Where the judge or MHRO "determines that extended involuntary emergency treatment is necessary," a "certification shall be filed with the director of the facility and a copy served on the person, such other parties as the person requested to be notified pursuant to section 302(c), and on counsel." *Id.* § 7303(d)(1), (e).

Should an MHRO certify that an extended section 303 commitment is appropriate, the committed person may "petition to the court of common pleas for review of the certification." *Id.* § 7303(g). The court must hold a hearing "within 72 hours after the petition is filed unless a continuance is requested by the person's counsel." *Id.* "The hearing shall include a review of the certification and such evidence as the court may receive or require." *Id.* "If the court determines that further involuntary treatment is necessary and that the procedures prescribed by the [MHPA] have been followed, it shall deny the petition. Otherwise, the person shall be discharged." *Id.*

Section 304 of the MHPA allows for court-ordered involuntary treatment up to 90 days.[5]  *Id.* § 7304(g).  Petitions for involuntary commitment under section 304 may be made for persons already committed under section 302 or 303, *see id.* § 7304(b), as well as for persons not currently committed, *see id.* § 7304(c).  Subsection (a) describes who may be committed under section 304:

> (1)　A person who is severely mentally disabled and in need of treatment, as defined in section 301(a), may be made subject to court-ordered involuntary treatment upon a determination of clear and present danger under section 301(b)(1) (serious bodily harm to others), or section 301(b)(2)(i) (inability to care for himself, creating a danger of death or serious harm to himself), or 301(b)(2)(ii) (attempted suicide), or 301(b)(2)(iii) (self-mutilation).
>
> (2)　Where a petition is filed for a person already subject to involuntary treatment, it shall be sufficient to represent, and upon hearing to reestablish, that the conduct originally required by section 301 in fact occurred, and that his condition continues to evidence a clear and present danger to himself or others.  In such event, it shall not be necessary to show the reoccurrence of dangerous conduct, either harmful or debilitating, within the past 30 days.

*Id.* § 7304(a)(1),(2) (internal footnote omitted).  For persons already subject to treatment under sections 303, 304, or 305, the county

_____

[5] Some exceptions in section 304, not germane to this appeal, allow for involuntary treatment for a period not to exceed one year.  *See* 50 P.S. § 7304(g)(2).

administrator or the director of the facility may petition for court-ordered involuntary treatment. *Id.* § 7304(b)(1). For persons not already in involuntary treatment, "[a]ny responsible party may file a petition in the court of common pleas requesting court-ordered involuntary treatment for any person . . . for whom application could be made under [section 304](a)." *Id.* § 7304(c)(1).

As with section 303, the subject of the petition is entitled to assistance of counsel and a hearing on the petition. *Id.* § 7304(b), (c). If the person is currently committed, the hearing shall be held within five days. *Id.* § 7304(b)(4). If the person is not currently committed, then the person shall be served a copy of the petition "at least three days before the hearing." *Id.* § 7304(c)(4). Persons subject to such a hearing have the right "to the assistance of an expert in mental health," the right to silence, "the right to confront and cross-examine all witnesses and to present evidence in his own behalf," and the right to a private hearing upon request. *Id.* § 7304(e)(1)-(4). "A stenographic or other sufficient record [of the hearing] shall be made[.]" *Id.* § 7304(e)(5). The court must impound the record, which may be "obtained or examined only upon the request of the person or his counsel or by order of the court on good cause shown." *Id.* As with section 303, "[t]he hearing shall be conducted by a judge or by a [MHRO] and may be held at a location other than a courthouse when doing so appears to be in the best interest of the person." *Id.* § 7304(e)(6). If the judge or MHRO finds by

> clear and convincing evidence that the person is severely mentally disabled and in need of treatment and subject to subsection (a), an order shall be entered directing treatment of the person in an approved facility as an inpatient or an outpatient, or a combination of such treatment as the director of the facility shall from time to time determine.

*Id.* § 7304(f). Inpatient treatment may be ordered "only after full consideration has been given to less restrictive alternatives." *Id.*

As with section 303, if the determination is made by an MHRO, the person has a right to appeal the certification to the court of common pleas. *Id.* § 7109(b). This review process is identical to the section 303 certification review process. *Id.*

Under section 305, the trial court may extend a period of involuntary treatment under section 304(g) or 305 for up to 180 days. *Id.* § 7305(a). To commit a person under section 305, the trial court must make the requisite findings in section 304(a) and (b), and must further find "a need for continuing involuntary treatment as shown by conduct during the person's most recent period of court-ordered treatment." *Id.* Persons found dangerous to themselves under section 301(b)(2) are "subject to an additional period of involuntary full-time inpatient treatment only if [they] ha[ve] first been released to a less restrictive alternative." *Id.* However, that requirement does not apply where the judge or MHRO determines "that such release would not be in the person's best interest." *Id.* As with sections 303 and 304, if the determination is made by MHRO certification, the person may seek review in the court of common pleas. *Id.* § 7109.

## II.   Civil Commitment History

The trial court in this case urges affirmance based on what it describes, twice in a two-page opinion, as S.M.'s "20 year history of violent and aggressive behavior."  **See** 1925(a) Op. at 1; **id.** at 2.  While the court states that "evidence was received" of that history, the record does not support that claim.  While some references to S.M.'s history were made at both the May 19, 2016 MHRO hearing and the May 25, 2016 de novo hearing, almost no actual evidence to that effect was introduced.  Indeed, the basis for the trial court's assertion appears to be a statement made by counsel for the County during oral argument at the latter hearing.  **See** N.T., 5/25/16, at 14 ("When she's on medication, she's not dangerous particularly to herself or others.  But when she goes off the medication, Your Honor, she becomes violent.  That's the history – for about **a 20-year history of violent and aggressive behavior**.") (emphasis added).

Perhaps recognizing the problem with both the record below and the certified record in this Court, the County attached an appendix to its brief, which it describes as an "extensive history of [S.M.'s] involuntary commitments."  County's Br. at 21, Appx. A.  According to the County, this history of commitments was referenced at the MHRO hearing and before the trial court.  The County also asserts that the trial court "properly took judicial notice of [this] history . . . , which it had access to via a secure electronic record system maintained by Allegheny County, and it expressly relied on said history in reaching it[s] determination."  County's Br. at 21.

It is well settled that "an appellate court is limited to considering only the materials in the certified record." ***Commonwealth v. Preston***, 904 A.2d 1, 6 (Pa.Super. 2006). "Additionally, '[i]t is black letter law in this jurisdiction that an appellate court cannot consider anything which is not part of the record in the case.'" ***Commonwealth v. McBride***, 957 A.2d 752, 757 (Pa.Super. 2008) (quoting ***Commonwealth v. Martz***, 926 A.2d 514, 524-25 (Pa.Super. 2007)). "Materials that have only been included in briefs, but are not part of the record cannot be considered. . . . [because they] 'are not evidence and cannot be considered part of the record . . . on appeal.'" ***Id.*** at 757-58 (quoting ***Commonwealth v. Stanton***, 440 A.2d 585, 588 (Pa.Super. 1992)).

At the MHRO hearing, S.M. did make some reference to her history of involuntary commitments. ***See*** MHRO Hr'g, 5/19/16, at 12:00-12:20.[6] Further, at the *de novo* hearing, the County Solicitor referred to a series of commitments, but none of those preceded 2014. ***See*** N.T., 5/25/16, at 14. Despite these representations, the County did not enter into evidence the history of S.M.'s involuntary commitments, either by testimony or documentary evidence. Indeed, neither the transcript of the *de novo* hearing nor the audio recording of the MHRO hearing make any reference

_____

[6] The only record of this hearing is an audio recording. We therefore cite to the testimony by timecode.

either to the so-called "case summary" attached to the County's brief or to the information contained therein.

Further, while the County argues that the trial court took judicial notice of this evidence, the record does not support this claim. The trial court never stated that it was taking judicial notice of S.M.'s involuntary commitment history, but rather merely stated that "evidence was received that [S.M.] has a 20-year history of violent and aggressive behavior." 1925(a) Op. at 1.[7] We find no testimonial or documentary evidence in the record to support this statement. Accordingly, we will not consider either the "case summary" attached to the County's brief as Appendix A, as it is extra-record "evidence," or the assertion that S.M. has a 20-year history of violent and aggressive behavior.

## III. Sufficiency of the Evidence

_____

[7] We note that S.M. disputes the County's claim that S.M. has a 20-year history of violent and aggressive behavior, which, by itself, raises a concern as to whether this "history" was appropriate for judicial notice. "[D]isputed questions of fact are not within the domain of judicial notice." *Haber v. Monroe Cnty. Vocational-Technical School*, 442 A.2d 292, 296 (Pa.Super. 1982). Additionally, where a trial court takes judicial notice *sua sponte*, the court must put the parties on notice and give those parties an opportunity to object. *See* Pa.R.Evid. 201(e); *M.P. v. M.P.*, 54 A.3d 950, 955 (Pa.Super. 2012) (noting that where a trial court takes judicial notice of a fact *sua sponte*, under Rule 201(e) the parties are entitled "to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed"). However, because there is no indication in the record that the trial court took judicial notice of S.M.'s commitment history, we need not address whether a trial court may take judicial notice of such a history.

We next address S.M.'s claim that the evidence presented to the trial court was insufficient to support her involuntary commitment. According to S.M., the County failed to present clear and convincing evidence that S.M. continued to pose a clear and present danger to herself, as the County did not present evidence that S.M. "had ever attempted suicide, mutilated herself, . . . attempted to mutilate herself," or that she was unable to care for herself such that she "would be at risk of death, serious bodily injury, or physical debilitation if released." S.M.'s Br. at 21-22 (referencing 50 P.S. § 7301(b)(2)(i)-(iii)). S.M. argues the County merely showed that her treating physician's major concern was her "resistance to taking her psychiatric medications at the prescribed level," and claims that no one testified "that a decrease in the dosage of [S.M.]'s medication, or even the complete cessation of it, would cause withdrawal symptoms of such magnitude as to threaten serious bodily injury." *Id.* at 22. Additionally, S.M. asserts that the County's evidence – that in December 2015, S.M. went several days without eating, went several nights without sleep, and made racial slurs to other residents – similarly fails to show by clear and convincing evidence that S.M. posed a clear and present danger to herself.

As the trial court correctly noted, "[i]n reviewing a trial court order for involuntary commitment, we must determine whether there is evidence in the record to justify the court's findings." *T.T.*, 875 A.2d at 1126. "Although we must accept the trial court's findings of fact that have support

in the record, we are not bound by its legal conclusions from those facts."

*Id.*

### A. Record Evidence of S.M.'s Mental Health History

For a person to be involuntarily committed under section 305 of the MHPA, the trial court must first make the required findings under subsections 304(a) and (b).[8]  ***See supra***, at 6-8.   Under subsection

_____

[8] Subsection (b), entitled "Procedures for Initiating Court-ordered Involuntary Treatment for Persons Already Subject to Involuntary Treatment," provides as follows:

> (1)　Petition for court-ordered involuntary treatment for persons already subject to treatment under sections 303, 304 and 305 may be made by the county administrator or the director of the facility to the court of common pleas.

> (2)　The petition shall be in writing upon a form adopted by the department and shall include a statement of the facts constituting reasonable grounds to believe that the person is severely mentally disabled and in need of treatment. The petition shall state the name of any examining physician and the substance of his opinion regarding the mental condition of the person. It shall also state that the person has been given the information required by subsection (b)(3).

> (3)　Upon the filing of the petition the county administrator shall serve a copy on the person, his attorney, and those designated to be kept informed, as provided in section 302(c), including an explanation of the nature of the proceedings, the person's right to an attorney and the services of an expert in the field of mental health, as provided by subsection (d).

*(Footnote Continued Next Page)*

304(a)(2), "it shall be sufficient to represent, and upon hearing to reestablish, that the conduct originally required by section 301 in fact occurred, and the [the person's] condition continues to evidence a clear and present danger to himself or others." 50 P.S. § 7304(a)(2). This Court has held that the petitioner need not relitigate the initial commitment and that the trial court may "consider[] . . . a patient's original commitment as contained in that patient's commitment history . . . as long as the patient's commitment history shows that the requisite behavior occurred in the past." *Commonwealth v. Romett*, 538 A.2d 1339, 1342, 1343 (Pa.Super. 1988). If the patient challenges that original commitment, "the burden is on the patient to show that the original commitment was improper." *Id.* at 1342.

At the commitment hearing, any evidence presented by the County must be received in "strict compl[iance] with the rules of evidence generally applicable to other proceedings which may result in an extended deprivation of an individual's liberty."[9] *In re Involuntary Commitment of Barbour*,

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯

> (4) A hearing on the petition shall be held in all cases, not more than five days after the filing of the petition.
>
> (5) Treatment shall be permitted to be maintained pending the determination of the petition.

50 P.S. § 7304(b) (internal footnotes omitted).

[9] The United States Supreme Court has emphasized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979).

- 17 -

733 A.2d 1286, 1288 (Pa.Super. 1999). Here, the record suggests that the County did not introduce **any** evidence of S.M.'s initial section 302 or 303 commitment. In fact, the County admitted that it did not have a copy of the section 302 or 303 petition that started the current series of commitments:

> [COUNTY SOLICITOR]: And I do not see in here a copy – there was a petition. I know there was a petition, but I don't see a copy of it in here, the 303. I don't see a copy of the petition in here of the 303 which I believe was in September of 2014.
>
> THE COURT: Can you explain to me how [S.M.] is a danger to herself or others?
>
> [COUNTY SOLICITOR]: When she's on medication, she's not particularly dangerous to herself or others. But when she goes off the medication, Your Honor, she becomes violent. That's the history -- for about a 20-year history of violent and aggressive behavior.
>
> THE COURT: Okay, you didn't say if that was in there. That's what I'm saying. I don't know.
>
> I would just like to see something that said she was violent to herself or others.
>
> He looked at it. It's not in there I guess. Can you tell me that?
>
> [COUNTY SOLICITOR]: Your Honor, I believe it's on the electronic docket, the petition, the 302 or 303 petition. I don't have a copy of it with me now. The one that led to this. Because the testimony here was even at the Pathways she had to go back because she was not taking -- she went through a period since the last hearing of not taking medication on her own. She discontinued it on her own. When she stopped taking the medicine, she was lacking the ability to care for herself by not –
>
> THE COURT: By not taking the medication.

N.T., 5/25/16, at 13-15.

The only reference that the trial court made to documentary evidence was a "file" before it. *Id.* at 12. Assuming that the "file" referenced by the Court is in the certified record in this matter, we have not found the section 302 or 303 petition therein.[10] Rather, the record includes a series of section 304 and 305 petitions, which offer no insight into S.M.'s prior history of commitments. Accordingly, we conclude that the trial court could not base its decision on S.M's alleged 20-year commitment history or the circumstances of the initial commitment under section 302 or 303.

### B. Whether the County Presented Sufficient Evidence to Support the Section 305 Commitment

We now must determine whether the evidence in the certified record was sufficient to support S.M.'s commitment. The burden is on the petitioner to "prove the requisite statutory grounds by clear and convincing evidence." *Romett*, 538 A.2d at 1342. "Our Supreme Court has defined clear and convincing evidence as 'testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.'" *In re S.T.S., Jr.*, 76 A.3d 24, 38 (Pa.Super. 2013) (quoting *In re R.I.S.*, 36 A.3d 567,

---

[10] As noted in above, the County stated at the May 25th hearing that this information might have been in the "electronic docket," to which the trial court may well have had access. N.T., 5/25/16, at 14. However, there is no indication in the certified record or in the trial court's opinion that it reviewed whatever section 302 or 303 petition that might have started this series of commitments.

- 19 -

572 (Pa. 2011)). "[T]he clear and convincing evidence test 'has been described as an "intermediate" test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt.'" *Id.* (quoting **Commonwealth v. Meals**, 912 A.2d 213, 219 (Pa. 2006)). Where a mental health review officer has made a recommendation, the trial court is to conduct a *de novo* review of that determination. **Barbour**, 733 A.2d at 1288.

This Court's decision in **Romett** guides our review of a section 305 involuntary commitment. There, we reviewed a section 305 recommitment that had been based on the appellant's violent tendencies towards others. **Romett**, 538 A.2d at 1340. Specifically, the appellant originally had been committed "as a result of assaultive behavior towards family members," and this commitment was "extended three times before the [section 305] hearing." **Id.** At that hearing, the "appellant violently slapped a nurse across the face." **Id.** at 1341. Appellant's treating psychiatrist testified that "appellant had also recently shown assaultive behavior toward him." **Id.** The treating psychiatrist testified that appellant had a mental illness "manifested in delusions, poor impulse control, and beliefs that others are 'out to get her.'" **Id.** Therefore, the treating psychiatrist testified that "cessation of appellant's treatment would reasonably result in future assaultive behavior. . . . [and] appellant posed a danger to others rather than to herself." **Id.** Based on this evidence, the trial court ordered

appellant involuntarily committed for 30 days of inpatient treatment, followed by 150 days of outpatient treatment.

We affirmed the trial court's decision. *Id.* at 1343. In coming to that conclusion, we held that:

> [F]or a person to be recommitted for an additional period of treatment, it need not be established that the person has inflicted or attempted to inflict serious bodily harm upon another within the past thirty days, as required for the original commitment. The Act specifically states that on recommitment it is not necessary to show that the patient committed an overt act within 30 days of the hearing. It is necessary however for the court to find that within the patient's most recent period of institutionalization, the patient's conduct demonstrated the need for continuing involuntary treatment, . . . i.e. his condition continues to evidence a clear and present danger to himself or others . . . .

*Id.* at 1341-42 (internal citations omitted). Based on this interpretation, we concluded that there was clear and convincing evidence that supported the trial court's finding that Romett posed a clear and present danger to others, as Romett exhibited violent conduct which resulted in the initial commitment, continued to do so during the commitment period, and had a "diagnosis as a paranoid schizophrenic with delusions that others are threatening her, together with [a] prognosis that her assaultive behavior would continue without further treatment." *Id.*

Here, in its Pennsylvania Rule of Appellate Procedure 1925(a) opinion, the trial court explained that involuntary commitment and treatment was appropriate because: (1) S.M. had a "20 year history of violent and

- 21 -

aggressive behavior; (2) in December 2015, S.M. discontinued her medications, after which S.M. did not eat for several days nor sleep for several nights; and (3) S.M. used racial slurs towards other facility residents. 1925(a) Op. at 1-2. We have already determined that the trial court received no proper evidence regarding either S.M.'s alleged history of aggressive and violent behavior or the circumstances that led to her initial commitment under section 303. Therefore, it could not use such information to support the commitment.

Further, the evidence actually received at the *de novo* hearing, including the audio recording of the MHRO hearing, failed to meet the clear and convincing standard. At the MHRO hearing, the treating psychiatrist's primary complaint was that S.M. was not taking her medication in therapeutic doses. ***See*** MHRO Hr'g, 5/19/16, at 3:00-3:15. While the psychiatrist did testify that S.M. has a severe mental illness, specifically a schizoaffective bipolar disorder, the only symptoms he described were that S.M. believed (1) that her disease was better treated through homeopathic remedies rather than allopathic medicine, and (2) various hospital and state officials were conspiring and colluding with her mother to keep her involuntarily committed. ***Id.*** at 5:54-7:50. While the treating psychiatrist did testify that her illness and unwillingness to take her medication in therapeutic doses affected her judgment, ***id.*** at 7:54-8:10, he did not testify that S.M. posed a danger to herself or that there was "a reasonable probability that death, serious bodily injury or serious physical debilitation

would ensue within 30 days unless adequate treatment were afforded." 50 P.S. § 7301(b)(2)(i). Instead, the essence of his testimony was that S.M. would be better off taking her medications in therapeutic doses, and that the best way to ensure that she did so was through continued involuntary commitment.

The live testimony presented at the *de novo* hearing likewise did not meet the standard necessary for S.M.'s involuntary commitment. The County's only witness at the hearing was Kelly Mullen, the program director at Pathways. While Mullen testified that when Pathways transferred S.M. back to WPIC in December 2015, S.M. discontinued her medication and "was not sleeping for nights . . . in a row" nor "eating for several days in a row," the only other physical manifestation to which Mullen testified was S.M.'s use of "racial slurs to other residents [in] the facility which was starting to create an atmosphere of hostility." N.T., 5/25/16, at 4-5. Mullen also testified that S.M. was not taking therapeutic doses of her medication prescribed by Dr. Chengappa. *Id.* at 7-8. This information was insufficient to support the trial court's conclusion that S.M. should be involuntarily committed under section 305 of the MHPA.

In sum, we conclude that the County did not show by clear and convincing evidence that S.M. posed a clear and present danger to herself within the meaning of section 304(a), 50 P.S. § 7304(a). While we appreciate the challenges posed to the effective treatment of persons with long histories of serious mental illness, the serious deprivations of liberty

authorized by the MHPA demand that such deprivations be justified through strict compliance with statute's substantive and procedural requirements.[11]

Order reversed.[12]

Judgment Entered.

_(signature)_

_____

[11] The County dedicates a substantial portion of its brief to arguing it need not show that the patient engaged in "new, patently dangerous conduct to justify an extension of the patient's involuntary commitment." County's Br. at 11. According to the County, section 305's conduct requirement is virtually synonymous with the requirement that the patient's "condition continues to evidence a clear and present danger to himself or others" under section 304(a). *Id.* at 12 (quoting *Romett*, 538 A.2d at 1341). While we agree with the County that our courts have not fully explicated section 305's conduct requirement, because we conclude that the County failed to meet its burden of proof under section 304(a), we need not address the meaning of "conduct" under section 305.

[12] We do not make this determination lightly, particular due to Dr. Chengappa's concerns about S.M.'s medication regimen and Mullen's concerns regarding S.M.'s unusual behavior. Our ruling, however, does not preclude the County from filing a new petition for involuntary commitment, at which time the County may present appropriate evidence supporting involuntary commitment under the MHPA.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/15/2017</u>