J-S23011-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: G.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: G.M. | No. 1693 MDA 2021 |

Appeal from the Order Entered December 3, 2021
In the Court of Common Pleas of Berks County
Civil Division at No: 265-2021 MH

BEFORE: STABILE, J., McLAUGHLIN, J., and COLINS, J.[*].

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 13, 2022**

Appellant, G.M., appeals from the December 3, 2021 order affirming a ten-day extension of her involuntary commitment pursuant to the Mental Health Procedures Act ("MHPA"), 50 P.S. §§ 7302 and 7303. We reverse.

The record reveals that Appellant was involuntarily committed, pursuant to 50 P.S. § 7302,[1] to Haven Behavioral Hospital ("Haven") on November 27, 2021. On November 30, Haven filed a petition to extend Appellant's commitment pursuant to 50 P.S. § 7303.[2] At the conclusion of a December

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Section 7302 provides for an emergency examination and an initial commitment of up to 120 hours. 50 P.S. § 7302.

[2] Section 7303 permits an extension of the initial commitment for up to twenty days if the person continues to be severely mentally disabled as per the terms of § 7301, which we will discuss in the main text. 50 P.S. § 7303.

1, 2021 hearing before a Mental Health Review Officer ("MHRO"), Appellant's commitment was extended for ten days. On December 2, 2021, Appellant filed a petition for review before the Berks County Court of Common Pleas. Pursuant to Appellant's request, the trial court reviewed the audio recording of the December 1, 2021 hearing before the MHRO, and issued an order affirming the extension of Appellant's commitment. This timely appeal followed.

Appellant argues that Haven failed to present sufficient evidence in support of the Section 303 extension because Appellant's treating psychiatrist—Haven's sole witness at the December 1, 2021 hearing—failed to explain how Appellant posed a clear and present danger to herself or others. Appellant's Brief at 4.[3] After careful consideration, we agree.

Section 7301 ("Section 301") of the Mental Health Procedures Act ("MHPA") provides for the involuntary commitment of persons severely in need of help. It provides, in relevant part:

> **(a)** **Persons Subject.--**Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself, as defined in subsection (b),

---

[3] Haven and the Berks County Solicitor's Office have filed briefs in support of affirmance.

or the person is determined to be in need of assisted outpatient treatment as defined in subsection (c).

**(b)    Determination of Clear and Present Danger**

[…]

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, **and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act**[.]

50 P.S. § 7301 (emphasis added).

In essence,

The MHPA provides for involuntary emergency examination and treatment of persons who are "severally mentally disabled and in need of immediate treatment." 50 P.S. § 7301(a). It then authorizes increasingly long periods of commitment for such persons, balanced by increasing due process protections in recognition of the significant deprivations of liberty at stake. ***See In re A.J.N.***, 144 A.3d 130, 137 (Pa. Super. 2016) (highlighting MHPA's purpose as "an enlightened legislative endeavor to strike a balance between the state's valid interest in imposing and providing mental health treatment and the individual patient's rights") (quoting ***In re Hutchinson***, 454 A.2d 1008, 1010 (Pa. 1982)); ***In re Ryan***, 784 A.2d 803, 807 (Pa. Super. 2001) ("The legislative policy reflected in the [MHPA] is to require that strict conditions be satisfied before a court order for commitment shall be issued. Such a policy is in accord with the recognition that commitment entails a massive deprivation of liberty.") (quoting ***Commonwealth v. Hubert***, 494 Pa. 148, 430 A.2d 1160, 1162 (1981)). Accordingly, "[i]n applying the [MHPA,] we must take a balanced approach and remain mindful of the patient's due process and liberty interests, while at the same time permitting the mental health system to provide proper treatment to those

involuntarily committed to its care." ***In re S.L.W.***, 698 A.2d 90, 94 (Pa. Super. 1997).

***In re S.M.***, 176 A.3d 927, 930-31 (Pa. Super. 2017).

"[I]n reviewing a trial court order for involuntary commitment, we must determine whether there is evidence in the record to justify the court's findings." ***Id.*** at 935.

> The burden is on the petitioner to prove the requisite statutory grounds by clear and convincing evidence. Our Supreme Court has defined clear and convincing evidence as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. [T]he clear and convincing evidence test 'has been described as an intermediate test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt. Where a mental health review officer has made a recommendation, the trial court is to conduct a *de novo* review of that determination.

***Id.*** at 937 (internal citations and quotation marks omitted).

In ***S.M.***, the patient argued the "County merely showed that her treating physician's major concern was her 'resistance to taking her psychiatric medications at the prescribed level,' and that no one testified "'that a decrease in the dosage of [her] medication, or even the complete cessation of it, would cause withdrawal symptoms of such magnitude as to threaten serious bodily injury.'" ***Id.*** at 935. Additionally, she asserted that "the County's evidence— that in December 2015, she went several days without eating, went several nights without sleep, and made racial slurs to other residents"—failed to show by clear and convincing evidence that she posed a clear and present danger

to herself. *Id.* at 935. In reviewing the sufficiency of the evidence in support

of her commitment,[4] this Court wrote:

> At the MHRO hearing, the treating psychiatrist's primary complaint was that S.M. was not taking her medication in therapeutic doses. While the psychiatrist did testify that S.M. has a severe mental illness, specifically a schizoaffective bipolar disorder, the only symptoms he described were that S.M. believed (1) that her disease was better treated through homeopathic remedies rather than allopathic medicine, and (2) various hospital and state officials were conspiring and colluding with her mother to keep her involuntarily committed. While the treating psychiatrist did testify that her illness and unwillingness to take her medication in therapeutic doses affected her judgment, he did not testify that S.M. posed a danger to herself or that there was a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded. Instead, the essence of his testimony was that S.M. would be better off taking her medications in therapeutic doses, and that the best way to ensure that she did so was through continued involuntary commitment.

*Id.* at 938–39 (record citations omitted). Likewise, this Court concluded that

the patient's periodic refusal of food and her inability to sleep did not justify

an extended commitment. *Id.* at 939. We therefore reversed the order

affirming the patient's commitment.[5]

---

[4] The patient in *S.M.* was committed under § 7305. Section 7303, as set forth above, permits an extension of the original Section 302 commitment for up to 20 days. Sections 7304 and 7305 authorize longer commitments, for up to 90 and 180 days, respectively. Regardless, the *S.M.* Court's analysis of a patient's clear and present danger to herself is pertinent to our review of the issue before us.

[5] The *S.M.* Court noted that the order before it was not moot even though the patient's commitment likely ended prior to the conclusion of appellate review. Because involuntary commitments implicate an important liberty interest, and because most involuntary commitments will expire before an

*(Footnote Continued Next Page)*

In ***Commonwealth ex. rel. Gibson v. DiGiacinto***, 439 A.2d 105 (Pa. 1981), our Supreme Court review the extended voluntary commitment of a patient who, while in county prison for criminal mischief and criminal trespass, was diagnosed with schizophrenia and paranoid delusions. ***Id.*** at 106. On one occasion, a corrections officer found the patient extinguishing a burning newspaper in his cell. On another occasion, the patient was found in possession of a twisted piece of coat hanger apparently intended as a weapon. ***Id.*** The Supreme Court found no sufficient evidence that the patient was a clear and present danger to himself. The burning newspaper was not evidence of an attempt at self-harm, as the patient was permitted to smoke and there was no evidence the newspaper was intentionally lit on fire. ***Id.*** at 107. As to the twisted coat hanger, there was no evidence that the patient used or threatened to use it to harm himself or others. ***Id.*** Finally, there was no evidence that the patient's behavior changed as a result of occasional noncompliance with his medication. ***Id.***

Instantly, the recording of the December 2, 2021 hearing before the MHRO reveals that Dr. Ramesh Eluri, Appellant's treating psychiatrist, testified that Appellant was treated at Haven approximately a week prior to the stay currently at issue; she was discharged with a diagnosis of bipolar disorder.

---

appellate court can review them, they present issues that are "capable of repetition and may evade review." ***S.M.***, 176 A.3d at 930 n.3 (quoting ***In re Barbour***, 733 A.2d 1286, 1287 n.3 (Pa. Super. 1999)).

- 6 -

N.T. Hearing, 12/2/21, at 1:00-1:15.[6]  He saw her daily (three days in succession) during the most recent § 7302 admission.  *Id.* at 5:37-48. Appellant was compliant with her medication. *Id.* at 5:48-5:53.  She was able to meet her daily living needs while staying at Haven.  *Id.* at 6:30-6:39. Appellant did not show any aggressive or assaultive behavior toward others while at Haven. *Id.* at 6:43-6:54.  Nonetheless, she needed lots of redirection from the staff at Haven. *Id.* at 3:40-3:42.

Dr. Eluri testified that Appellant presents with "hyberverbosity, pressured speech, flight of ideas, looseness of association, grandiosity, paranoid delusions, and hyperactivity." *Id.* at 2:37-2:51.  Appellant believed her son was "head of mass destruction" for the United States Navy, and because of Appellant's § 7302 commitment "he's going to do that." *Id.* at 1:40-1:50.  Appellant believed she was raped by five people while staying at another hospital. *Id.* at 1:53-2:08.  Dr. Eluri testified that Appellant believed the reason for the present admission under § 7302, was that she was accused of stealing forty pumpkin pies. *Id.* at 2:13-2:20.  Appellant claimed she was gifted pumpkin pies and was distributing them to friends who needed them. *Id.* at 8:22-8:45.

When Dr. Eluri spoke to Appellant about staying for a few more days to stabilize her symptoms, she refused. *Id.* at 3:45-4:02.  Dr. Eluri testified that

---

[6]  Our citations are to the audio recording of the December 2 2021 hearing.

an additional commitment under § 7303 was therefore necessary for medication management and stabilization of Appellant's symptoms. *Id.* at 4:17-4:23; 8:52-9:06. She was very skeptical about taking injectable medication. *Id.* at 5:53-6:05. Dr. Eluri also noted the back-to-back admissions as justifying an extended commitment. *Id.* at 4:28-4:32. Dr. Eluri asked for a twenty-day commitment but conceded that a shorter stay, perhaps ten to fifteen days, might suffice. *Id.* at 9:14-9:50.

Asked if Appellant presents a danger to herself through a lack of self-care, Dr. Eluri responded, "That's my assumption," because of the two hospital admissions in close proximity because of her inability to overcome her self-care issues. *Id.* at 4:55-5:11. In addition, Dr. Eluri believed Appellant was a danger to herself because she reported delivering pumpkin pies to neighbors' doorsteps. *Id.* at 7:02-7:20. Dr. Eluri described this as "very bizarre behavior" that "could be" dangerous. *Id.* at 7:21-7:34. *Id.* at 7:39-7:45.

In her testimony, Appellant once again asserted that her son was "head of mass destruction" for the United States, and that she was not delusional in saying so. *Id.* at 10:44-10:57. She also claimed she was distributing twenty baby pumpkins, not pumpkin pies that a friend gave her. *Id.* at 10:48-11:05. She put the pumpkins on her friends' porches for Thanksgiving. *Id.* at 12:26-12:28. Appellant testified that she was raped in Reading hospital for five hours before she came to Haven. *Id.* at 11:06-11:12; 11:24-11:25. She attributed the fact that she seemed "scattered" to the trauma of that

experience. *Id.* at 11:13-11:20. She denied ever needing redirection from the Haven staff. *Id.* at 11:39-11:40. Appellant stated she would agree to accept injectable medication if she could go home. *Id.* at 11:44-11:50.

To summarize, Dr. Eluri testified that it was his assumption that Appellant posed a clear and present danger to herself because of several commitments in quick succession, thus calling into question her ability to care for herself. Dr. Eluri also testified that her claimed behavior of delivering pumpkins (or pumpkin pies) to friends' doorsteps "could be" dangerous. But Dr. Eluri also testified that Appellant was not resistant to medication and was meeting her own daily needs while staying at Haven. Dr. Eluri asked for an extra twenty days of involuntary commitment, or at least ten to fifteen, in order to stabilize Appellant and get her on the appropriate medication, including injectables.

*S.M.* is similar to the instant matter in that there, as here, the treating doctor believed the best way to ensure proper medication was an additional period of commitment. We conclude, in accord with *S.M.*, that the need to manage medication is not, of itself, sufficient evidence to support an extended commitment under § 7303.

We find *Gibson* instructive insofar as our Supreme Court noted the lack of evidence of the patient's intentions. Because there was no evidence that the patient intentionally lit the burning newspaper found in his room, and because the patient had not threatened himself or anyone else with the coat

hanger fashioned into a weapon, there was no sufficient evidence to support a finding of the patient's clear and present danger to himself or others.

Instantly, there is nothing other than Dr. Eluri's speculative testimony to support a conclusion that Appellant's wanderings put her at clear and present danger of substantial bodily injury or death. Appellant's delivery of pumpkins (or pumpkin pies) does not sufficiently establish that she is in clear and present danger of death or bodily injury. Dr. Eluri testified only that such behavior "could be" dangerous. Assuming this event—or something like it—actually happened, there is no precise evidence of the location in which it occurred, no evidence of the safety (or lack thereof) of the location, and no evidence to suggest Appellant was likely to do the same thing again. Dr. Eluri's testimony on this point was couched in conditional language and not sufficient to establish that Appellant's condition put her in clear and present danger of death or serious bodily injury. Here, as in *Gibson*, that conclusion required an inferential leap not supported by evidence of record.

Similarly, there is no indication that Appellant's musings about her son's role as head of mass destruction for the U.S. Navy, or some other American governmental entity, was anything but delusional. Haven has never argued that Appellant, by and through the apparent threat of her son's misuse of his position, presented a clear and present danger to anyone else.

Finally, there is no basis for concluding that Appellant's allegations of having been raped at another hospital rendered her unsafe to herself or

- 10 -

others. As noted above, she was meeting her daily care needs at Haven and exhibited no aggressive behavior toward others.

For the foregoing reasons, we conclude that the record does not support the trial court's finding, by clear and convincing evidence, that Appellant presented a clear and present danger to herself. We therefore reverse the order extending Appellant's commitment under § 7303.

Order reversed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/13/2022