J-A14013-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: D.L. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: D.L. | : | |
| | : | |
| | : | No. 1673 MDA 2021 |

Appeal from the Order Entered November 19, 2021
In the Court of Common Pleas of Berks County Civil Division at No(s):
142-21-MH

BEFORE:   BENDER, P.J.E., STABILE, J., and STEVENS, P.J.E.*

MEMORANDUM BY BENDER, P.J.E.:        **FILED: AUGUST 1, 2022**

This is an appeal from a determination that arose following the filing of a petition requesting the extension of the involuntary commitment of Appellant, D.L., for a period of 90 days.  After review, we affirm.

In the trial court's abbreviated Pa.R.A.P. 1925(a) opinion, filed on January 19, 2022, the court stated in its entirety:

> This case arises from a hearing under the Mental Health Procedures Act, 50 P.S. § 7103 et seq. ("MHPA")[,] before the Berks County mental health review officer [("MHRO")] on a petition to extend, for a period of up to 90 days, the involuntary commitment of [D.L.] at Haven Behavioral Hospital [("Hospital")] in Reading, Berks County, Pennsylvania.  On October 20, 2021, a hearing was held by this [c]ourt in the above captioned matter on D.L.'s Petition for Review of the Certification for Extended Involuntary Commitment.  Following that hearing, the [c]ourt issued an order affirming the Certification for Extended Involuntary Commitment as well as an Opinion in support thereof

_____

* Former Justice specially assigned to the Superior Court.

on November 19, 2021. On December 20, 2021, D.L., through counsel, filed the instant appeal [from] this [c]ourt's November 19, 2021 Decision and Order. On December 22, 2021, this [c]ourt directed counsel for D.L. to file their [Pa.R.A.P. 1925(b)] Concise Statement of Errors Complained of on Appeal[,] and counsel for D.L. filed their Statement on January 12, 2022, raising the following issues which are in *verbatim* form in relevant part as follows:

> 1. The Hospital failed to present sufficient evidence to support the involuntary commitment of Appellant where testimony could not establish to a reasonable degree of medical certainty that Appellant had a mental illness that would be applicable for involuntary commitment under the Mental Health Procedures Act.

> 2. The Hospital failed to present sufficient evidence to support involuntary commitment where testimony could not provide any clear and present danger Appellant posed to herself or others outside of expressions Appellant made regarding using a firearm to protect herself in her own home if her home were invaded, and Dr. Coldren's testimony established the main factor in extending her commitment was her refusal to take medication prescribed by the [H]ospital.

> 3. The involuntary commitment of Appellant was against the weight of the evidence where Dr. Coldren never confirmed whether Appellant had a firearm or the ability to pose a clear and present danger to others.

> 4. The involuntary commitment of Appellant was against the weight of the evidence where Dr. Coldren discharged Appellant with a diagnosis of dementia and had considered dementia as a possible diagnosis throughout her inpatient stay despite a diagnosis of unspecified psychosis being provided for the purposes of the involuntary commitment.

Pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), the reasons for this [c]ourt's November 19, 2021 Decision and Order already appearing of record and addressing each of D.L.'s

> Errors Complained of on Appeal, the Superior Court is directed to this [c]ourt's Decision and Order dated November 19, 2021, where the detailed reasons for this [c]ourt's Order are delineated.

Trial Court's Pa.R.A.P. 1925(a) Opinion, 1/19/2022, at 1-2.

We must begin by determining whether D.L.'s case "is appealable, because appealability implicates our jurisdiction." *In the Interest of J.M.*, 219 A.3d 645, 650 (Pa. Super. 2019) (citing *In Interest of N.M.*, 186 A.3d 998, 1006 (Pa. Super. 2018) (quoting *Kulp v. Hrivnak*, 765 A.2d 796, 798 (Pa. Super. 2018) ("[Since we] lack jurisdiction over an unappealable order, it is incumbent on us to determine, … whether the appeal is taken from an appealable order.")). "Jurisdiction is purely a question of law; the appellate standard of review is *de novo* and the scope of review plenary." *Id.*

Upon receipt of D.L.'s Notice of Appeal and Docketing Statement, this Court issued a Rule to Show cause, indicating that:

> Appellant purports to appeal from the "Judgement entered on this matter November 19, 2021." Review of the trial court docket reveals a "miscellaneous" docket entry on that date. The trial court's Pa.R.A.P. 1925(a) opinion dated January 18, 2022, and filed January 19, 2022, states that the trial court "issued an order affirming the Certification for Extended Involuntary Commitment as well as an Opinion in support thereof on November 19, 2021." It is unclear, however, whether the trial court entered an order on November 19, 2021, as the document filed on November 19, 2021, does not state whether it is an opinion or an order.

Rule to Show Cause Order, 2/15/2022. D.L.'s counsel filed a timely response as directed by this Court in the Rule to Show Cause Order. The response provided, in part, the following:

> Appellant, D.L., through her counsel[,] Andrew Scott, Esq., represents that the docket with the prothonotary of the Berks

County Court of Common Pleas has been reviewed and only the document filed by the Honorable Madelyn S. Fudeman on November 19, 2021, was located and nothing else marked as an order after the *de novo* hearing was found. There is no disagreement, and I have no authority to suggest otherwise, that a final order is required to pursue this appeal. The document dated November 19, 2021, does not specify whether it is an opinion or order and the content does not make clear which it is either. However, our response would be that this should be treated as a *de facto* order as it was understood that this affirmed the MHRO decision. This was filed after a *de novo* hearing was held in this matter on October 20, 2021, and as of the writing of this letter, no separate order was ever filed.

In further support of this notion, the Honorable Madelyn S. Fudeman's 1925(a) opinion filed on January 19, 2022, refers to Appellant's appeal as arising from "this [c]ourt's November 19, 2021 Decision and Order." The Judge incorporated her November 19, 2021 filing as forming the basis for her 1925(a) opinion, and further directs the Superior Court to refer to its "Decision and Order dated November 19, 2021…." It appears clear from the record that the document was to be taken as a Decision and Order in this matter. Admittedly, the docket of the lower court labels the Decision and Order as "Miscellaneous," but the dockets for Civil Commitments in Berks County are also exceedingly sparse in the information they provide[,] which in consideration on how to square this with Pa.R.A.P. 301, … should arguably militate towards a more liberal interpretation.

D.L.'s Responsive Letter, 2/23/2022, at 1-2. The letter concludes that the trial court's decision "is sufficiently clear for the Superior Court to render a decision and that to quash the appeal at this stage unnecessarily delay[s] a resolution in this matter." *Id.* In response, this Court discharged the Rule to Show Cause, but indicated that this issue could be revisited by this panel. We do revisit the issue because, as noted above, the appealability implicates our jurisdiction. *See J.M.*, 219 A.2d at 650.

We begin by noting that the Hospital, with reliance on Pa.R.A.P. 301(a)(1), asserts that no order is appealable unless entered on the trial court's docket. Moreover, the Hospital contends that no order was entered; rather the November 19, 2021 decision was entered as "misc." and contained no information regarding the giving of notice as required by Pa.R.Civ.P. 236(b). The Hospital further cites *Frazier v. City of Philadelphia*, 735 A.2d 113, 115 (Pa. 1999), for the proposition that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." Additionally, the Hospital points out that an appeal must be taken from the trial court's order, not from an opinion, relying on *Lengyel v. Frank Black, Jr. Inc.*, 438 A.2d 1003, 1004 (Pa. Super. 1981), which states that "[a]ppeals do not lie from a mere opinion of the inferior court, since even though the appellate court can infer from the opinion filed what was intended, it can neither affirm nor reverse a decree which has never been entered."

Although not mentioned by the Hospital, the *Frazier* opinion further explains that the fact that,

> the parties may have received notice of the order does not alter the formal date of its entry and the associated commencement of the period allowed for appeal for purposes of the rules. The procedural requirements reflected in the rules serve to promote clarity, certainty and ease of determination, so that an appellate court will immediately know whether an appeal was perfected in a timely manner, thus eliminating the need for a case-by-case factual determination.

*Frazier*, 735 A.2d at 115. As in the instant case, the appellant in the *Frazier* case had received notice of the judgment, but "because there was no

corresponding entry in the docket, formal entry of the order did not occur under the rules, and the appeal period was not triggered." *Id.* Therefore, only after the actual notation was placed on the docket and Frazier perfected his appeal within thirty days after the notation was entered on the docket, his appeal was considered timely. Accordingly, our Supreme Court remanded the case for consideration of the merits.

Here, the trial court's identifying of its November 19, 2021 decision as an opinion and order does not meet the directives as stated in the *Frazier* decision. However, as noted in Appellant D.L.'s brief, Pa.R.A.P. 105(a) provides some guidance, stating that:

**Rule 105.  Waiver and Modification of Rules**

(a)  **Liberal construction and modification of rules**.  These rules shall be liberally construed to secure the just, speedy and inexpensive determination of every matter to which they are applicable  In the interest of expediting decision or for other good cause shown, an appellate court may, except as otherwise provided in Subdivision (b) of this rule, disregard the requirements or provisions of any of these rules in a particular case on application of a party or on its own motion and may order proceedings in accordance with its direction.

With reliance on Rule 105, which allows this Court to disregard requirements stated in any of the rules, it is apparent that, although the trial court did not specifically identify its decision entered on November 19, 2021, it clarified its intent that that document was a decision and order in its Rule 1925(a) Opinion. Moreover, by incorporating its November 19, 2021 "Decision and Order" into its Rule 1925(a) opinion, the issues identified by Appellant D.L.

were addressed by the trial court. Additionally, it is apparent that the parties were aware that the November 19, 2021 document was an affirmation of the MHRO's decision and that the Hospital would not be prejudiced if the appeal went forward. Clearly, the error rested on the trial court's failure to properly label the document and include the fact that notice to the parties of the entry of the document on the docket was provided. We do not condone these failures; however, because the parties were aware of the trial court's determination and Appellant D.L.'s appeal was timely, we will proceed with our review of the trial court's decision to affirm the MHRO's decision to extend the involuntary commitment of D.L. for ninety days.

Despite D.L.'s listing of four separate issues in her Concise Statement, her brief contains only one substantive issue, stating "[w]hether the [H]ospital failed to present sufficient evidence to support the involuntary commitment of D.L. where testimony could not establish to a reasonable degree of medical certainty that Appellant had a mental illness that would be applicable for involuntary commitment under the [MHPA]." D.L.'s brief at 4. To address this issue, "we must determine whether there is evidence in the record to justify the [trial] court's findings." *In re S.M.*, 176 A.3d 927, 935 (Pa. Super. 2017) (quoting *T.T.*, 875 A.2d 1123, 1126 (Pa. Super. 2005)). Moreover, "we must accept the trial court's findings of fact that have support in the record, [but] we are not bound by its legal conclusions from those facts." *Id.*

We have reviewed the extensive certified record, the briefs of the parties, the applicable law, and the thorough and well-crafted opinions authored by the Honorable Madelyn S. Fudeman of the Court of Common Pleas of Berks County, dated January 18, 2022, and November 19, 2021. We conclude that Judge Fudeman's comprehensive opinions properly dispose of the issue presented by Appellant D.L. on appeal and we discern no abuse of discretion or error of law. Accordingly, we adopt Judge Fudeman's opinions as our own and affirm the *de facto* order extending D.L.'s involuntary commitment.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/01/2022

IN RE: D.L.

IN THE COURT OF COMMON PLEAS
BERKS COUNTY, PENNSYLVANIA
MENTAL HEALTH

Superior Court No. 1673 MDA 2021
Trial Court No. 141-21 MH

The Honorable Madelyn S. Fudeman

**Opinion,**        **January 18, 2022**

This case arises from a hearing under the Mental Health Procedures Act, 50 P.S. § 7103 *et seq.* ("MHPA") before the Berks County mental health review officer on a petition to extend, for a period of up to 90 days, the involuntary commitment of ██████████ ("D.L.") at Haven Behavioral Hospital in Reading, Berks County, Pennsylvania. On October 20, 2021, a hearing was held by this Court in the above captioned matter on D.L.'s Petition for Review of the Certification for Extended Involuntary Commitment. Following that hearing, the Court issued an order affirming the Certification for Extended Involuntary Commitment as well as an Opinion in support thereof on November 19, 2021. On December 20, 2021, D.L., through counsel, filed the instant appeal to this Court's November 19, 2021, Decision and Order. On December 22, 2021, this Court directed counsel for D.L. to file their Concise Statement of Errors Complained of on Appeal and counsel for D.L. filed their Statement on January 12, 2022, raising the following issues which are in verbatim form in relevant part as follows:

1. The Hospital failed to present sufficient evidence to support the involuntary commitment of Appellant where testimony could not establish to a reasonable degree of medical certainty that Appellant had a mental illness that would be applicable for involuntary commitment under the Mental Health Procedures Act.

1

2. The Hospital failed to present sufficient evidence to support involuntary commitment where testimony could not provide any clear and present danger Appellant posed to herself or others outside of expressions Appellant made regarding using a firearm to protect herself in her own home if her home were invaded, and Dr. Coldren's testimony established the main factor in extending her commitment was her refusal to take medication prescribed by the hospital.

3. The involuntary commitment of Appellant was against the weight of the evidence where Dr. Coldren never confirmed whether Appellant had a firearm or the ability to pose a clear and present danger to others.

4. The involuntary commitment of Appellant was against the weight of the evidence where Dr. Coldren discharged Appellant with a diagnosis of dementia and had considered dementia as a possible diagnosis throughout her inpatient stay despite a diagnosis of unspecified psychosis being provided for the purposes of the involuntary commitment.

Pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), the reasons for this Court's November 19, 2021 Decision and Order already appearing of record and addressing each of D.L.'s Errors Complained of on Appeal, the Superior Court is directed to this Court's Decision and Order dated November 19, 2021, where the detailed reasons for this Court's Order are delineated.

BY THE COURT:

The Honorable Madelyn S. Fudeman

2

IN RE:                                          :    IN THE COURT OF COMMON PLEAS OF
                                                :    BERKS COUNTY, PENNSYLVANIA
                                                :
                                                :
D.L.,                                           :
                                                :    TERM NO. 142-21-MH
                                                :    JUDGE: MADELYN FUDEMAN

This case arises from a hearing under the Mental Health Procedures Act, 50 P.S. §7103 *et. seq.* ("MHPA") before the Berks County mental health review officer on a petition to extend, for a period of up to 90 days, the involuntary commitment of ~~D.L.~~ ~~D.L.~~ at Haven Behavioral Hospital ("Hospital") in Reading, Berks County, Pennsylvania. ~~D.L.~~, age 60, was admitted to Hospital on March 31, 2021 as a result of an involuntary commitment initiated in York County by her daughter. Notes of Testimony, October 20, 2021. ("N.T.") P. 6, 13, 17-25. ~~D.L.~~ was alleged by her daughter to have suffered delusions of neighbors breaking into her home and harassing her. It was further reported that various surveillance equipment was set up and no intruders were present. ~~D.L.~~ was observed by family members speaking to persons not actually present. ~~D.L.~~ had also threatened to shoot these intruders should she catch them in her home. ("N.T.") P. 3, 14-2. Although there were some questions regarding ~~D.L.'s~~ access to firearms, the family reported she had no access to firearms, but she did have access to a BB gun. Reports from the family also alleged that ~~D.L.~~ had called police so many times they no longer responded, and she was refusing to leave the house to see medical doctors, despite the fact that she had not seen a Doctor in years. (N.T. pgs. 30-31). ~~D.L.~~ was transferred to Hospital from York County following her initial presentation, therefore, hearings on two petitions to extend the involuntary commitment were conducted in Berks County.

1

The first petition to extend the involuntary commitment was heard according to paragraph 3 of the Motion for Continuance dated June 10, 2021 filed on behalf of ▮▮ D.L. (the "Motion"): "On April 1, or 5 (counsel's records are unclear), 2021 on the second petition, after a hearing before the [M]ental [H]ealth [R]eview [O]fficer ▮▮ D.L. was committed involuntarily for a period not to exceed 20 days pursuant to 50 PA C.S. § 7303...no appeal was taken." At paragraph 4 of the Motion it is stated that a subsequent hearing was held before the mental health review officer on April 23, 2021 pursuant to which ▮▮ D.L. was committed to Hospital for a period not to exceed 90 days under the MHPA §7304. Despite the extension for up to 90 days, ▮▮ D.L. was discharged from Hospital on April 26th, three days following the hearing. (N.T. p. 22, 10-11).

On May 13, 2021 a hearing was held by this Court on ▮▮ D.L.'s Petition for Review of the Certification for Extended Involuntary Commitment ("Petition"). The Petition did not request a *de novo* hearing, however, this Court granted petitioner's request for additional time to amend the Petition and gather records and information. A status conference was held on June 10, 2021, at which time the solicitor for Berks County appeared and did not oppose a request to further continue the time to amend the Petition and to set a *de novo* hearing no less than 30 days from the date of the conference. The hearing was set for October 5, 2021, then moved to October 20, 2021. It is noted that the Berks County solicitor appeared but argued that Berks County was not a proper party to the instant action as ▮▮ D.L. was a resident of York County. ▮▮ D.L., it should be noted, is represented by the Berks County Public Defender by way of an agreement between the Berks County and York County Public Defenders. ▮▮ D.L.'s counsel subsequently

2

amended the Petition to substitute Hospital for Berks County as Respondent. Counsel for the Hospital appeared telephonically from Tennessee at the hearing on October 20, 2021 and requested that the physicians be permitted to testify without counsel.

At the hearing, testimony was offered by the physicians from Hospital who treated D.L. The first to testify was Dr. Sean Coldren who said he was the treating physician to D.L., and approximately one week prior to the hearing before the mental health officer he prepared the petition to extend her commitment for up to 90 days, the petition under review in the instant proceedings. (N.T. p.22 5-8). Dr. Coldren testified that he observed D.L.'s behavior as "very paranoid". N.T. p. 3, 14-16. He further testified that he was informed of D.L.'s family's assertions of her "psychotic symptoms" which he said he also personally observed D.L. develop while hospitalized, and that he also knew of the family's reports of D.L.'s delusional claims of neighbors coming into her house, and installation of cameras which disproved these intrusions. N.T p. 3 16-21. Dr. Coldren further testified that he was aware of the family's concerns over D.L.'s remarks that she might need to get a gun to defend herself. N.T. p. 3 22-24.

Dr. Coldren described D.L. as "very guarded, hypervigilant and very reluctant to speak with the Doctor, nurses or social workers. While he never heard her refer to using a gun, he did hear from her about the neighbors breaking into her house. (N.T. p. 4, 19-25; p. 5 1-16). Dr. Coldren went on to explain the basis for his determination to request an extension of D.L.'s commitment: "her inability to process information beyond certain areas. She couldn't change set. If you talked about this she could talk about how there was nothing wrong with her. There were these things going on at home. But if you asked her hypotheticals, if you tried to get her to examine it from a

3

different way she couldn't do it. *These are hallmarks of psychosis.*" [emph. added] (N.T. p. 5, 17-23).

When questioned by the undersigned as to whether there was any way to ascertain with any degree of medical certainty, based on what he personally observed, whether the behaviors with D.L. were caused by Dementia or psychosis, Dr. Coldren responded: "That is very hard. Because psychosis can be a component of Dementia. So, she is admitted with a diagnosis of psychosis, not schizophrenia or Bi-Polar or any of those things because she has no track record of it. So, she is suddenly psychotic. We don't know why. It is happening at a very atypically late stage in life. (N.T. p7, 10-19).

D.L.'s counsel argued that under the MHPA, dementia is not a sufficient basis for involuntary commitment. When the Court inquired further as to D.L.'s working diagnosis, asking whether D.L.'s age of 60 years is an indicator that it is more likely dementia than it is a psychosis, or if the two are usually independent, Dr. Coldren answered: "They are not mutually independent. The psychosis is—the symptoms that she had, which could be from any number of causes; one of which could be Dementia. Another could be that she is medically ill and that is causing the problem. So part of our task in the first thirty days was making sure that there wasn't a serious medical problem causing it, which there wasn't." (N.T. p. 8 1-13). He continued: "...trying to get a sense of whether she had a serious mood disorder that manifested later in life which did not appear to be the case. And so we are left with unspecified psychotic disorder, which is supposed to be a tentative working diagnosis while you figure it out. And then you are supposed to make a decision as you go along. Which way you think the actual illness is going. Is it a – from Dementia? Is it from a late onset of Schizophrenia? The Court: So it

4

is a diagnosis of elimination essentially? Dr. Coldren: Yeah. "(N.T. p.8, 14-24).

Dr. Coldren indicated that ▓▓▓▓ [D.L.] was only somewhat able to independently manage her activities of daily living ("ADL") and required prompting from staff, thus, he was concerned about ▓▓▓▓ [D.L.'s] ability to care for herself and her husband's inability to help her, as he thought the husband had some medical issues as well. (N.T. p. 10, 17-20). However, Dr. Coldren concluded that a "main factor" in his decision to request the extension "was that she was refusing to take antipsychotic medicine or engage in treatment" (N.T. p. 10, 9-11), "Which [lead] me to believe that she would perhaps get even worse than how she was very quickly. (N.T. p.10, 13-14). Dr. Coldren again raised his concerns regarding ▓▓▓▓ [D.L.'s] threats to shoot any intruders at her home: "I have to go back to the hearsay about the gun. I don't have any way of knowing whether she had a gun or was going to get a gun really. The Court: Did you talk to her about it at all? Dr. Coldren: I did. The Court: And she ... Dr. Coldren: She would not engage with me on anything. She wouldn't tell me I have this problem. This is how I want to solve it. All she said was I am not sick. There are people harassing me. You need to let me out. The Court: Did you ever ask her point blank do you have a gun? I don't think so. I believe I assumed that she did...I don't have any way to know whether she had a gun or was going to get a gun really." (N.T. p 10, 23-25, p. 11, 1-11). He also reiterated his concerns about her ability to care for herself (N.T. p. 11, 12-14).

Dr. Coldren testified that although dementia was a leading suspected underlying cause for ▓▓▓▓ [D.L.'s] unspecified psychosis, the only mention of dementia in ▓▓▓▓ [D.L.'s] chart was in the discharge summary. The Court inquired: "And at any point during your treatment of this patient, did you consider Dementia as a likely cause of the psychosis?

5

Dr. Coldren: Yes. Throughout. The Court: But it wasn't mentioned in the records at all? Dr. Coldren: No. We discussed it vigorously at our team meetings, but I reviewed the records the other day and I didn't mark it in, and neither did any of the other people who saw her." (N.T. pgs. 16-17). The Court then asked Dr. Coldren: "You just went through a host of different reasons that can cause… psychosis. It can be medical, it can be, you know, late manifestation of some other issue. But it can also be Dementia. And as her age showed that any of those other causes, if you ruled out the possibility of a medical cause, all of the other causes are less likely because of her age. It would be very late onset for some of the other causes right? Dr. Coldren: Well medical issues become more likely as you get older. The Court: You ruled those out? Dr. Coldren: Yes. The Court: So why would you not have at some point had have said likely caused by Dementia? Dr. Coldren: I don't want to put that in unless I was sure. The Court: You said you can't be sure unless you have an autopsy? Dr. Coldren: Right. Yeah. One of the things that I have to be very careful of is what label I hang on people." (N.T. p. 17). The Court continued: How can you be sure that that somebody is suffering from psychosis caused solely by Dementia other than an autopsy? Dr. Coldren: Sure. Sure. By the preponderance of factors. It just is what factors are present and what are absent. Somewhat in the nature of the symptoms. If there is cognitive incapacity that you can see separate from the psychosis, all of those things can combine to make you feel that it is more and more likely. The Court: Did she have that? Dr. Coldren: Yes. The Court: She did? Dr. Coldren: Yes. But to nail it down you want a functional assessment. Something like what Office of Aging does. And neuropsychological testing. The Court: And was there ever any neuropsychological testing or functional assessment done for her? Dr. Coldren: Those are things that I wanted

6

to get done and why I had not... The Court: Why weren't those things done when you ruled out medical reasons and you knew that it would be late onset for the other things? Why wouldn't you automatically do those things? Dr. Coldren: Logistically it is difficult to get a neuropsychologist to come into the Hospital. Also, clinically, if a person is in an active psychosis, that distorts the results of the neuropsychological testing. The Court: I see. Dr. Coldren: So routinely, what happens is that you try to get the psychosis as well as possible. Neuropsychological testing is a complex battery of things. So what I wanted and recommended on her discharge is that she follow up and get that done. The Office of Aging assessment was applied for. The Court: It was? When? Dr. Coldren: I will say a weekish before she was discharged. (N.T pgs. 18-19).

In summary, Dr. Coldren conceded that dementia was not listed in the Hospital records as a suspected underlying cause of ~~D.L.'s~~ psychosis, but it was nonetheless increasingly the leading suspected cause as other possible causes were ruled out. He requested an extension of up to 90 days because, at the time he prepared the petition for up to 90 days' extension, he believed ~~D.L.~~ was a threat to her own safety, and that of others due to her delusional thinking; her failure to take all prescribed antipsychotic medicine, her inability to independently attend to her own ADLs without prompting and support from Hospital staff and his understanding that her husband was unable to provide adequate support; and care at home and perhaps paramount, her threats to shoot any of the intruders she delusionally believed she saw in her home.

Dr. Coldren did not testify at the hearing held on the Petition to extend (which he prepared), pursuant to MHPA § 7304 because he was out on vacation at the time of the hearing. Dr. Marian Georgiev, who represented the Hospital at that hearing, testified that

7

he requested the extension of up to 90 days based upon his evaluation of D.L.'s behavior as "very paranoid, delusional toward medical staff, denied that she had any mental problems" and that although D.L. was cooperative in taking medicines to address her medical conditions including high blood pressure and a urinary tract infection, consistent with her denial of any mental health issues, she refused to take her anti-psychotic medications. (N.T. p.35 17-25; p. 36, 1- 4). Dr. Geogiev testified that more than a week before the hearing he administered anti-psychotic medications by injection over D.L.'s objection and her refusal to take the medicine orally, but she continued to believe that she did not need psychotropic medication. Subsequently, he believed she might have begun to take the medicine orally, but only because she knew it would be injected if she refused, (N.T. p. 38, 8-25; p. 39, 1-18).

D.L.'s counsel argues that, according to Dr. Geogiev, D.L. was independent in taking care of her ADLs (N.T.p. 42); and that at the time Dr. Georgiev saw D.L. before the hearing she was taking her antipsychotic medication orally. (N.T. p. 46). However, this is a selective application and substantial mischaracterization of Dr. Gerogiev's testimony. By the Court: "But you thought she was capable of caring for herself?" Dr. Georgiev: "Well, she was eating and sleeping well. She said when she is going to be discharged, she is not going to take her medications…Because she doesn't need them. Because she does not believe she has any mental illness." (N.T. p. 42, 1-8).

D.L.'s counsel further argued that D.L.'s threat to shoot people was limited to intruders in her home, not her family. However, Dr. Georgiev's testimony was that D.L. told him "she believed that intruders were going into her home, harassing her, stealing her thing[s]. She was talking she wanted to shoot them." (N.T. pp. 36, 5-15).

8

Counsel for **D.L.** ▓▓▓, in Petitioner's Proposed Conclusions of Law, cites to MHPA §7102 for its provision, in pertinent part, that "persons who are mentally retarded, senile, alcoholic or drug dependent shall receive mental health treatment only if they are also diagnosed as mentally ill, but these conditions of themselves <u>shall not be deemed to constitute mental illness</u>". [Emph. Added]. Additionally, and MHPA § 7301 is cited for the provision that "Persons who may be subject to involuntary emergency examination and treatment subsection (a) Person Subject.--- Whenever a person is severely mentally disabled and in need of treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as the result of <u>mental illness</u> [Emph. Added], his capacity to exercise self-control, judgment, and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or himself."

Counsel for **D.L.** ▓▓▓ argues that, "As described by Dr. Coldren and consistent with *webmd.com*, the unspecified psychosis which was the listed "diagnosis" that formed the basis for **D.L.'s** ▓▓▓ commitment is a symptom and not a disease and which can be caused by a number of possible diseases including physical medical conditions, schizophrenia and bipolar disorders (that is mental illnesses) or dementia (*webmd* also lists substance abuse, extreme stress and trauma as possible causes)."

First, no evidence was admitted regarding "*webmd*", so no regard will be paid to its references. Nonetheless, it appears that the argument rests on the assumption that **D.L.** ▓▓▓ suffered from dementia which is insufficient as a diagnosis to support an involuntary commitment. However, the argument completely disregards the testimony of

9

**D.L.'s**

███████ physicians that she was delusional; imagined intruders in her home; threatened to shoot them; said she would discontinue taking anti-psychotic medications if discharged; was paranoid about her daughter and medical staff; and with the understanding that her husband was unable to provide the support and care she would need to continue treatment on a regular basis, the Hospital was the least restrictive setting for the care she required.

Petitioner argues that the MHPA places upon the party seeking involuntary commitment, in this case the Hospital, the burden to prove by clear and convincing evidence that the person to be committed is such a person as described in MHPA §7301. Petitioner argues and that Hospital has failed to establish by clear and convincing evidence that **D.L.** ███████ suffered from a mental illness. It is further argued in Petitioner's Proposed Conclusions of Law that:

The Doctor's testimony was to the effect that the 'diagnosis' of unspecified psychosis was something of a stop gap while they figured out what was causing the psychosis, that is, as the court characterized it a 'diagnosis of elimination'. In other words, the Hospital had yet to determine the cause of the psychosis and one of the two possibilities was mental illness. **D.L.** ███████ may indeed have been seriously mentally disabled but at the time of the 304 proceeding the doctors had yet to determine that she was so due to a mental illness.

This argument is specious as it rests upon a foundation of selective disregard of critical testimony. The second extension was requested based upon **D.L.'s** ███████ delusional, paranoid thoughts, threats against others, denial of any mental illness, and statements that she would discontinue any psychotropic medications upon discharge. The extension was

10

requested for the precise purpose of allowing the necessary time to conduct further testing and medication adjustments to provide a clearer indication of the underlying cause of D.L.'s psychosis. It was understood by D.L.'s doctors, at the time the request for the 90 day extension was drafted, that her husband was not able to provide the necessary support and care she required, so the Hospital was the least restrictive alternative. When, at the time of her release, her husband presented and said he could provide the care and support she needed, and a plan doctors considered feasible was in place for the necessary testing and treatment to be administered and conducted on an outpatient basis, the physicians consented to D.L.'s discharge. Indeed, the record is contrary to the argument that D.L.'s only condition was dementia. The record is replete with reports from the family and evaluations of physicians of paranoid, delusional and psychotic thinking, and denial of these symptoms of D.L., accompanied by threats to stop taking medication and to shoot imaginary intruders. Thus, the determination, under the MHPA that a person must suffered [sic] from a mental health condition sufficient to support an extension of her involuntary commitment is the same determination of the Court following the hearing de Novo.

BY THE COURT:

_____
The Honorable Madelyn S. Fudeman