J-S33031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.B. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 205 WDA 2023 |

Appeal from the Order Entered January 23, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CC: 18 of 2023

BEFORE:   BENDER, P.J.E., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: October 20, 2023**

Appellant M.B. appeals from the January 23, 2023, order entered in the Court of Common Pleas of Allegheny County Orphans' Court, which involuntarily committed her for inpatient psychiatric treatment with St. Clair Memorial Hospital.  M.B. challenges the sufficiency of the evidence for her civil commitment pursuant to Section 7304 of the Mental Health Procedures Act ("MHPA").[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: On January 4, 2023, the Allegheny County Department of Human Services Office of

_____

[*] Former Justice specially assigned to the Superior Court

[1] 50 P.S. §§ 7101-7503.

Behavioral Health ("DHS") presented a petition for commitment under Section 7303 of the MHPA requesting the emergency involuntary inpatient civil court commitment of M.B at St. Clair Memorial Hospital. On that date, M.B. stipulated to the recommendation of Bruce Wright, M.D. ("Dr. Wright"), that she be committed for not more than twenty days, and Mental Health Review Officer Jennifer Price ("MHRO Price") issued a certification. Thus, M.B.'s involuntary commitment was set to expire on January 23, 2023.

However, prior to the expiration of M.B.'s emergency involuntary commitment, on January 13, 2023, DHS filed a petition under Section 7304 of the MHPA seeking additional involuntary inpatient commitment of M.B. for a period not to exceed ninety days due to her continued dangerous behavior. The petition contained a notation that M.B. was unable to sign an informed consent form, and DHS attached to the petition a proper notice with intent to file a petition for extended involuntary treatment.

On January 20, 2023, a tele-health hearing was conducted before MHRO Price regarding the Section 7304 petition.[2] At the hearing, Dr. Wright, who is a board-certified psychiatrist, testified he was treating M.B., and he diagnosed her with "a psychotic disorder not otherwise specified." N.T., 1/20/23, at 4. He testified M.B.'s psychotic disorder is "severe," and she is "severely mentally disabled." *Id.* Dr. Wright indicated he was seeking additional inpatient

---

[2] M.B. was present and represented by counsel during the hearing.

treatment for M.B. *Id.* at 5. Specifically, the following relevant exchange occurred during the direct examination of Dr. Wright by DHS's counsel:

Q. And, doctor, what is causing you to seek additional inpatient treatment today?

A. She has persistent symptoms. She was admitted on an involuntary commitment due to dilutional—paranoid thoughts formal thought disorder specifically disjointed into logical thoughts and aggression.

She was aggressive toward her daughter, who was the petitioner. She has persistent symptoms. It's my concern if she were released at this time there would be a reoccurrence of dangerous behavior.

Q. And, doctor, what persistent symptoms have you observed or your staff?

A. She has not been aggressive in the hospital. She has been intrusive with staff and with other patients. She has continued paranoid thoughts and continued formal thought disorder. As I mentioned, [she has] disorganized, illogical, disjointed thoughts.

\*\*\*

Q. Doctor, how is the patient responding to treatment or medication?

A. She has been compliant with medication, but I would say there's still disorder in that she's very disjointed.

It's very hard to follow her stream of thought. She seems to be a little less suspicious; although, there's still an element of some suspiciousness and paranoia. So, she may be—to answer your question slightly better but still very symptomatic.

Q. And, doctor, if additional treatment is authorized, what would you need to see from [M.B.] to be able to discharge her safely?

A. Well, compliance. As I mentioned, she has been compliant but only reluctantly so. So, I would like to see improved insight so that I feel confident she will comply with medication outside of the hospital, and I would like to see an improvement in the psychotic symptoms.

*Id.* at 5-6.

Dr. Wright opined that additional inpatient treatment was the least restrictive treatment option. *Id.* at 7. He testified M.B. does not have "insight into her psychiatric illness," and, thus, she does not "understand that she has a problem[.]" *Id.* He opined that, absent inpatient treatment, M.B. would have a "persistence of her symptoms and a risk of reoccurring dangerous behaviors." *Id.* He noted he was committed to discharging M.B. as soon as it was safe to do so. *Id.*

On cross-examination, Dr. Wright explained that M.B. is so intrusive that it is "very difficult to disengage from her." *Id.* at 8. She demands immediate attention, and when she is given attention, it is very hard for staff and other patients to "disengage from that interaction." *Id.* Dr. Wright admitted that M.B. had not been aggressive in the hospital towards staff or patients; however, she did "barricade her daughter in the room" on an occasion. *Id.*

Dr. Wright explained that M.B.'s thoughts are neither logical nor goal directed. *Id.* She can't get "from Point A to Point B" in any logical manner. *Id.* Dr. Wright reaffirmed that inpatient treatment in the hospital was the least restrictive option for M.B. to have her mental health needs met. *Id.* at 9. He opined she does not presently have the insight needed to comply with her medication, and although she was not aggressive while in the "controlled and protected environment" of the hospital, she was aggressive when she was not committed to the hospital. *Id.* at 9-10. Dr. Wright specifically opined that, within a reasonable degree of medical certainty, in "[his] professional

opinion there would be a reoccurrence of the dangerous behavior" if M.B. were released from inpatient treatment at that time. *Id.* at 10.

On redirect examination, Dr. Wright testified that, on one occasion during the initial emergency twenty-day involuntary commitment, M.B. barricaded her daughter in a hospital room and would not allow her to leave. *Id.* at 11-12. It took "coercion" by the staff to convince M.B. to unlock the door. *Id.* at 12.

M.B. testified she would like to be discharged from involuntary commitment. *Id.* at 14. She testified (verbatim):

> I do not have any passive aggressiveness. I did not hold my daughter in the room. I'm a Christian, and I was telling her that her holy spirit man is when you put on your armor of God. She gets a little anxious, and she gets very upset.
>
> I did not have any past things at my house. I just had no electric, and I had to make sure that everything was okay. If you have no electric, you're not sure what will happen. So, I had to keep—make sure that my house was secure, and I spoke with my group therapist, and we both agreed about no procrastination—do not procrastinate, you know, that I was ready to go home.
>
> I know how to set my goals straight in the right path. I'm assured that I will be fine. I've made my way all my life in the right direction. I've never had any mental disorders. It was just due to a lot of COVID-19 and a lot of people that were changing their direction because of flooding and disasters that went through the town from 2018 to 2021, and I had a lot that I had to, you know, set forth and take care of.
>
> It's always depending upon the situation of where, you know, things go on. And I believe a lot of things with the hospital here—when I came a lot did not know of my situation. I came on very strongly, and a lot of that was due to that. I know that I will be fine, and I love my daughter very much and would never hold her down or hurt her. I raised her right.

I took care of a three-bedroom house on my own, took care of my parents since 1995….I know how to make my way and take care of myself. As I was quoting to you, I love my daughter very much and would never harm her, and I don't persist on my own way. I just take care of myself, and you do good onto others. But you stay out of other's business, and I just do what I have to do for myself. And I wish no bad on no one.

But I have the wisdom, insight, and good discernment how to take care of myself, and the right directive path and how to put things---set forth a schedule for myself.

And the medication I, you know, believe that it was fine when it was the lower—we had lowered the medicine, and it was absolutely fine with me before I was not on any medicine. I have no suspicion of nobody. I'm not paranoid.

There is a lot of things in my family line that a lot of—just the aggressiveness, just a lot of things that—the old school way that I, you know, grew up with. But I do not plug in—I plug into taking care of myself in the right directive path, and I truly believe that I would be fine going home.

\*\*\*

I'm a Christian. I'm a Christian. I believe in the mighty kingdom of God, and I raised my daughter---

*Id.* at 14-16.

At the conclusion of the hearing, MHRO Price dismissed the petition, and on January 20, 2023, DHS filed a petition for review with the orphans' court. On January 23, 2023, the orphans' court held a hearing, during which the recording from the January 20, 2023, hearing was played for the orphans' court.

By order filed on January 23, 2023, the orphans' court reversed the dismissal issued by MHRO Price and ordered the involuntary commitment of M.B. to the St. Clair Memorial Hospital for inpatient treatment pursuant to

Section 7304 of the MHPA for a maximum of ninety days beginning on January 20, 2023. This timely, counseled appeal followed,[3] and all Pa.R.A.P. 1925 requirements have been met.

On appeal, M.B. sets forth the following issue in her "Statement of Questions Presented" (verbatim):

1. Did the orphans' court err in reversing the decision of the Mental Health Review Officer (MHRO), who did not find that M.B. was a danger to herself or to others and denied the request for additional commitment pursuant to Section 7304 of the Mental Health Procedures Act?

M.B.'s Brief at 4 (suggested answer omitted).

On appeal, M.B. contends the orphans' court erred in reversing the order of MHRO Price and directing that she be involuntarily committed for inpatient treatment pursuant to Section 7304 of the MHPA for an additional period not to exceed ninety days. Specifically, M.B. contends the evidence was insufficient to justify her continued involuntary commitment under Section 7304 since "there was no evidence presented at the review hearing that M.B. is a clear and present danger to herself or to others." M.B.'s Brief at 18 (italics omitted). M.B.'s position is that, while some of her behavior "may be annoying

---

[3] Although M.B.'s ninety-day commitment order has expired, this matter is not moot. *See Commonwealth v. C.B.*, 452 A.2d 1372, 1373 (Pa.Super. 1982) (stating that because an "order of involuntary commitment affects an important liberty interest, and because by their nature most involuntary commitment orders expire before appellate review is possible, [an appeal therefrom] is not moot.").

or irritating to the person conversing with [her]," it did not rise to the level of a clear and present danger to herself or others, which the MHPA requires in order to justify continued involuntary commitment. M.B.'s Brief at 25.

This Court reviews determinations pursuant to the MHPA to "determine whether there is evidence in the record to justify the [orphans'] court's findings." *In re S.M.*, 176 A.3d 927, 935 (Pa.Super. 2017) (citation omitted). "Although we must accept the [orphans'] court's findings of fact that have support in the record, we are not bound by its legal conclusions from those facts." *Id.*

> We briefly summarize the MHPA:
>
> The MHPA provides for involuntary emergency examination and treatment of persons who are "severally mentally disabled and in need of immediate treatment." 50 P.S. § 7301(a). It then authorizes increasingly long periods of commitment for such persons, balanced by increasing due process protections in recognition of the significant deprivations of liberty at stake. Accordingly, in applying the MHPA, we must take a balanced approach and remain mindful of the patient's due process and liberty interests, while at the same time permitting the mental health system to provide proper treatment to those involuntarily committed to its care.

*In re S.M.*, 176 A.3d at 930-31 (some citations omitted and formatting altered).

Section 7301(a) describes the circumstances under which a mentally disabled person may be subject to involuntary treatment:

> Whenever a person is severely mentally disabled and in need of immediate treatment, [she] may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, [her]

capacity to exercise self-control, judgment and discretion in the conduct of [her] affairs and social relations or to care for [her] own personal needs is so lessened that [she] poses a clear and present danger of harm to others or to [herself], as defined in [50 P.S. § 7301(b)].

50 P.S. § 7301(a).

Relevantly, Section 7301(b)(1) defines clear and present danger of harm to others, and Section 7301(b)(2) defines clear and present danger of harm to herself, in relevant part, as follows:

(1) .... For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

(2) Clear and present danger to [herself] shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that [she] would be unable, without care, supervision and the continued assistance of others, to satisfy [her] need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act;….

50 P.S. § 7301(b)(1), (2)(i).

Section 7304 permits court-ordered involuntary treatment for up to ninety days. 50 P.S. § 7304(g). Section 7304(a)(2) states the criteria for involuntary treatment of a person that is already subject to involuntary treatment:

(2) Where a petition is filed for a person already subject to involuntary treatment, it shall be sufficient to represent, and upon hearing to reestablish, that the conduct originally required by section [7301(b)] in fact occurred, and that [her] condition

continues to evidence a clear and present danger to [herself] or others….In such event, it shall not be necessary to show the reoccurrence of dangerous conduct, either harmful or debilitating, within the past 30 days.

50 P.S. § 7304(a)(2).

In ***In re S.M.***, ***supra***, this Court clarified Section 7304(a)(2) as follows:

[T]he petitioner need not relitigate the initial commitment and….the [orphans'] court may consider a patient's original commitment as contained in that patient's commitment history as long as the patient's commitment history shows that the requisite behavior occurred in the past. If the patient challenges that original commitment, the burden is on the patient to show that the original commitment was improper.

***In re S.M.***, 176 A.3d at 936 (citations omitted and formatting altered).

In sum, under Section 7304(a)(2), a petitioner must prove two factors. First, the petitioner, at a hearing, must "reestablish" the patient's prior conduct, which qualified as a clear and present danger to herself or others, "in fact occurred." ***See*** 50 P.S. §§ 7301(b)(1)-(2), 7304(a)(2). Second, the petitioner must establish the patient's condition continues to evidence a clear and present danger to herself or others. 50 P.S. § 7304(a)(2).

Regarding the first factor, in the case *sub judice*, M.B. specifically concedes there is no dispute that DHS established the first factor, *i.e.*, her prior conduct, which resulted in her original commitment, qualified as a clear and present danger to herself or others, and it in fact occurred. ***See In re S.M.***, ***supra***. That is, she concedes "there is no question that the initial Section 7302 petition that committed M.B. to involuntary treatment was properly filed and decided. Moreover, M.B. consented to the initial up-to-20

- 10 -

days of confinement and treatment under Section 7303."[4]  M.B.'s Brief at 13-14.  Accordingly, we proceed to examine whether DHS established the second factor, *i.e.*, M.B.'s condition continues to evidence a clear and present danger to herself or others.  ***See In re S.M.***, ***supra***.

Here, in analyzing the second factor, the orphans' court relevantly indicated the following:

> Per the tape of the January 20, 2023, hearing, which was played in open court on January 23, 2023, Bruce Wright, M.D., who is [M.B.'s] treating psychiatrist, testified that [M.B.] has "a psychotic disorder not otherwise specified" in the "severe" range. N.T., 1/20/23, at 4.  He stated that [M.B.] has persistent symptoms and that if she were released there would be a reoccurrence of dangerous behavior.  [M.B.] has continued paranoid thoughts and continued formal thought disorder.  Her thoughts are "disjointed" and "illogical" (*i.e.*, she cannot get from Point A to Point B, her thoughts "do not make sense").  [***Id.***] at 5, 8-9.  While [M.B.] has been compliant with medication [during the time she has been committed], she is reluctant to take the medication, and Dr. Wright expressed his concern that she will not comply with the medication requirements outside the hospital setting.  [***Id.***] at 6-7.  In his professional opinion, within a reasonable degree of medical certainty, Dr. Wright further stated that additional inpatient treatment is the least restrictive treatment option because he does not believe [M.B.] has the

_____

[4] In any event, we note the record contains M.B.'s commitment history, including her original commitment, which was based on her severe mental disability.  ***See In re S.M.***, ***supra***.  DHS sought the original Section 7303 civil commitment based on an application completed by M.B.'s adult daughter.  Specifically, M.B.'s daughter indicated M.B. could not care for herself, could not pay bills, could not take care of her basic needs, could not make decisions for her own well-being, was violent, was paranoid, did not make sense when having a conversation, threw temper tantrums, and threatened to kill her daughter.  She noted that M.B. often lived in a home with no utilities because she could not remember to pay the bills, would not eat because she believed her food had been poisoned, and believed people were following her.

insight into her psychiatric illness to understand that she has a problem [or] that she will comply with treatment by taking her mediation [*sic]* outside the hospital setting. Dr. Wright stated that he will discharge [M.B.] as soon as it can be done safely. [*Id.*] at 7.

[M.B.] made a statement to [MHRO Price] in a rather rambling fashion. She stated that she loves her daughter, and she would not harm her. She further stated that she has "no suspicion of nobody," she is not paranoid, and she "would be fine going home." [*Id.*] at 14-16.

Based upon [the orphans'] court's further review of the transcripts, it is abundantly clear that the reversal of the dismissal was proper under the facts of the case….Dr. Wright testified without hesitation that, in his professional opinion, [M.B.] was likely to engage in dangerous conduct in the future due to her continued lack of insight into her mental illness…[and] she would not maintain her medication regime.

Orphans' Court Opinion, filed 3/21/23, at 3-4 (some quotation marks omitted).

We conclude the orphans' court's factual findings are supported by the record, and we find no error in its legal conclusions. *See In re S.M.*, *supra*. Here, Dr. Wright testified M.B.'s severe mental disability, for which she was originally committed, persists with M.B. having paranoid thoughts, disjointed thoughts, illogical thoughts, and formal thought disorder. He noted that, during the time she has been receiving inpatient treatment, her severe mentally disabling symptoms have become "slightly better but [she is] still very symptomatic." N.T., 1/20/23, at 5.

Dr. Wright indicated that M.B. had been "reluctantly compliant" with taking her medication while she was receiving inpatient treatment. *Id.* at 5. He opined that, if M.B. were immediately released from inpatient mental

treatment, she would not remain compliant with taking her medications because she does not have insight into her own psychiatric illness. *Id.* at 7. However, he noted that, given further improvement in her psychotic symptoms, she may improve in the areas of awareness and compliance. *Id.*

Further, M.B.'s own statements to MHRO Price during the January 20, 2023, hearing confirmed Dr. Wright's testimony that she would not remain compliant with taking her medications if she were discharged from inpatient treatment. M.B. informed MHRO Price that "it was absolutely fine with me before I was not on any medicine." *Id.* at 16.

Moreover, Dr. Wright opined, beyond a reasonable degree of medical certainty, that M.B.'s persisting symptoms made it likely her dangerous behaviors would reoccur if she were released from inpatient treatment. As indicated *supra*, M.B. was originally involuntarily committed, in part, because she evidenced a clear and present danger to herself, including being unable to meet her own personal, medical, or safety needs to an extent that there was a reasonable probability of death, serious bodily injury, or serious physical debilitation. *See* 50 P.S. § 7301(b)(2)(i). In her testimony to MHRO Price during the January 20, 2023, hearing, M.B. demonstrated her continued inability to think logically so as to meet her own personal, medical, and safety needs. For example, she demonstrated no recognition that the reason her house did not have electricity arose from her failure to pay the utility bill. Further, she blamed the COVID-19 pandemic, as well as "flood[s] and disaster

that went through the town from 2018 to 2021," for her mental state. N.T., 1/20/23, at 14. Also, as indicated *supra*, she indicated she was "fine" without taking her medication. Thus, the orphans' court was justified in concluding DHS demonstrated M.B.'s condition continues to evidence a clear and present danger to herself. ***See*** 50 P.S. § 7301(b)(2)(i).

While our analysis could end at this point, we note the orphans' court was also justified in concluding DHS demonstrated M.B.'s condition continues to evidence a clear and present danger to others. ***See*** 50 P.S. § 7301(b)(1). M.B. was originally involuntarily committed, in part, because she evidenced a clear and present danger to others, including her daughter, who she threatened to kill.

During the time M.B. received inpatient medication and treatment under the original Section 7303 civil commitment, M.B. did not demonstrate aggressive behavior towards staff or other patients. However, M.B. barricaded herself and her daughter in a hospital room and did not unlock the door until being coerced by hospital staff. In her testimony to MHRO Price during the January 20, 2023, hearing, M.B. explained that she kept her daughter in her room because she wanted to tell "her that her holy spirit man is when you put on your armor of God." N.T., 1/20/23, at 14. The evidence demonstrates that, while being medicated, M.B.'s aggressive behavior improved; however, due to her severe mental disability, M.B. continued to be a clear and present danger to at least her daughter. ***See*** 50 P.S. § 7301(b)(1). Moreover, as

indicated above, Dr. Wright opined that if M.B. were released from inpatient treatment, she would not take her medication, and her dangerous behavior, including her behavior towards others, would reoccur.

Based on the record, we agree with the orphans' court that there is sufficient evidence to justify its findings that M.B's condition continued to evidence a clear and present danger to herself and others. ***See In re S.M.***, ***supra***. Therefore, we affirm the order extending M.B.'s commitment pursuant to Section 7304.

Affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/20/2023