J-S22030-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: P.T. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.T. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 191 WDA 2023 |

Appeal from the Order Dated January 23, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CC No. 16 of 2023

BEFORE:  PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.:                   **FILED: October 24, 2024**

P.T. appeals from the order extending his involuntary commitment to inpatient mental health treatment pursuant to 50 P.S. § 7303 ("section 303") of the Mental Health Procedures Act ("MHPA").[1]  After careful review, we affirm.

P.T. is a veteran who had been diagnosed with various mental health conditions, including severe depressive disorder, post-traumatic stress disorder ("PTSD"), and opioid use disorder.  On January 14, 2023, while P.T. was voluntarily participating in an in-patient drug addiction treatment program at the Veterans Administration ("VA"), he submitted to a psychiatric examination during which he refused to answer any questions related to whether he had thoughts of suicide since his admission.  The examining psychiatrist expressed concerns to the on-call psychiatrist, Alexandra Blaes,

_____

[1] ***See*** 50 P.S. §§ 7101-7503.

M.D. ("Dr. Blaes"), regarding P.T.'s reticence to answer the suicide-related questions, and her belief that if P.T. were to leave the facility, it would be for the purposes of harming himself. Later that day, a nurse at the facility informed Dr. Blaes that P.T. expressed his intention to leave the hospital's drug addiction program. The nurse further relayed that when she went to visit P.T. within the VA's domiciliary, he again refused to answer any questions relating to thoughts of harming himself. In response to these updates, Dr. Blaes told the nurse that she would proceed to P.T.'s domiciliary herself.

Prior to Dr. Blaes' arrival at the domiciliary, however, the same nurse received a call from P.T.'s brother, John, who told her that P.T. called him, and that P.T. was very distraught and in a dark place. John relayed that during their conversation, P.T. informed him that if P.T could find a long knife, he would go under a bridge and slit his throat and die. P.T. further indicated that he was going to write John a letter that he could share with their mother after P.T. was gone. The nurse immediately informed Dr. Blaes of this call.

Based on her determination that P.T. was severely mentally disabled, posed a threat of harm to himself, and was in need of emergency treatment, Dr. Blaes filed a petition to involuntarily commit P.T. to the VA hospital for up to 120 hours pursuant to section 7302 of the MHPA ("section 302"). Nearing the end of the section 302 commitment period, hospital staff expressed concern that if P.T. were released at the end of the 120-hour period, he would be a danger to himself. Accordingly, the hospital filed an application to extend

P.T.'s involuntary commitment for an additional twenty days pursuant to section 303.

On January 17, 2023, the parties appeared before a mental health review officer ("MHRO"), who conducted an informal review hearing on the section 303 application. P.T was represented by court-appointed counsel. At the hearing, Dr. Blaes testified to her involvement leading up to P.T.'s commitment under section 302. Specifically, she testified that she "was the on-call psychiatrist over the weekend . . .[when t]he psychiatrist that cared for [P.T.] informed [her] that since his admission, he had not really answered questions related to whether he had thoughts of suicide." N.T., 1/17/23, at 5. The psychiatrist caring for P.T. further relayed that she "was very worried about him and concerned that [if P.T.] were to choose to want to leave the facility, it would be for the purpose of going to harm himself." *Id*. Further, when Dr. Blaes was called into the V.A. on the morning of January 14th, she was informed by one of the nurses at the domiciliary facility, where P.T. was staying, that "[P.T.] had told [the nurse] that he wanted to leave the program and leave where he was staying at the domiciliary." *Id*.

When Dr. Blaes tried to interact with P.T., he refused to speak to her. Consequently, she relied primarily on the conversation the nurse had with P.T. and his brother, John, when making her decision to commit P.T. under section 302. *Id*. at 7. Dr. Blaes read into the record the medical chart containing the nurse's notes regarding this conversation and her interactions with P.T., as follows:

[P.T.] presented to the [domiciliary] window to get his scheduled medications. [P.T. asked] writer if there is a way to get to UD today. And once he gets to UD, can they arrange to get him where he is going?

I asked [P.T.] if something was wrong. He responded, "No, I am just leaving." I asked [P.T.] if he would like to have someone to talk to. He again said, "No, I am just leaving."

As instructed by CTAD notes, Dr. Blaes was called and apprised of this situation.

It was discussed that if [P.T.] would share his thoughts as to harming or not harming himself, he could possibly leave.

Writer went down to [P.T.]'s villa to ask if he had thoughts of harming himself. He refused to answer any questions, stating: "That is something that is personal to me and I don't want to talk about it.["]

Writer returned to [the domiciliary] office to inform Dr. Blaes of [this] conversation. Dr. Blaes stated that she was on route to the [domiciliary].

While in office, writer received a phone call from [P.T.]'s brother, John.

* * * *

John stated that [P.T.] had called him. He described him as being very distraught, in a dark place. Also stating that [P.T.] was going to write him a letter that he could share with their mother after he was gone, if he wished.

John also stated that [P.T.] told him if he could find a long knife, he would go under a bridge and slit his throat and die.

* * * *

Writer called Dr. Blaes back to get ETA and apprised her of the new findings.

Dr. Blaes was on site in the parking lot at this time. Immediate initiation of 302 was started.

Writer contacted VA police for assistance. Priority 1 called for transportation to UDD ECC.

[P.T.] came to [the] waiting area outside [the domiciliary] office. Dr. Blaes and I approached [him] to inform him about the 302 commitment. [P.T.] continued to decline to discuss his thoughts or plans to harm himself.

[P.T.] was told he was going to be transported to UD on a 302 commitment. He replied, "I am not going. I am not going. You can't do that to me." [P.T.] stated "I'm leaving," and began walking away.

VA police redirected [P.T.], as he attempted to go outside several exits, but was discouraged from doing so until [an] ambulance arrived.

*Id*. at 8-12.

Additionally, Melina Spyridaki-Dodd, M.D. ("Dr. Dodd"), the psychiatrist who treated P.T. at the VA hospital during his section 302 commitment, testified that in his first psychiatric interview, P.T. was very uncooperative and declined to answer any of Dr. Dodd's questions about suicidality. *See id*. at 18. Dr. Dodd further indicated that P.T. is an unreliable historian because he completely denies the same facts, sentences, and descriptions of lethality and suicidality that many staff members consistently described after speaking with him. *See id*. at 16. Further, Dr. Dodd communicated that when she gave P.T. the opportunity to call his brother to clarify the nature of their conversation during which P.T. made suicidal threats, P.T. refused. *See id*. at 16-17. When P.T. eventually agreed to speak about the suicidal threat he

discussed with his brother, Dr. Dodd indicated that P.T. attempted to downplay the threat, as follows:

> When I describe to [P.T.] his sentences [from his] conversation with his brother [*e.g*.,] "Give me a knife, I want to kill myself," and the letter [for his mother], he says, "Oh, no, no, no. I didn't want to kill myself. What I was talking to my brother about is just a fantasy scenario." He says, "You know, sometimes I have this odd, strange thought that, you know, how it would be possible if a patient cut his neck completely and the head rolled to the ground." And then he says, "I wonder if, you know, like we are slicing a chicken and then the body of the chicken still walks. I was wondering if, you know, the human being still is alive a few moments after the head falls to the ground, and you can actually, with your eyes over there, you can see the body over here. This is just strange things I'm thinking about."

*Id*. at 17.

Ultimately, Dr. Dodd testified that she was "deathly afraid that [P.T. would] go and kill himself, especially because right now he seems to be very cool, calm and collected, which is the most scary thing for a psychiatrist to see." *Id*. at 18. Dr. Dodd further testified that P.T. has severe depressive disorder, PTSD, and opioid use disorder and that, in her professional opinion, he suffered from a severe mental illness such that he needed further inpatient treatment at the VA hospital and "would likely kill himself if he walks out right now." *See id*. at 19.

P.T. thereafter testified that, within the last five days, he: had no suicidal thoughts; never took any steps to kill himself; never brought out or used a weapon; never harmed himself; and never told his brother that he was going to kill himself. *See id*. at 25-26. Notably, however, when P.T. was asked if

he wanted his brother testify at the hearing to clarify the nature of their conversation, P.T. said "no." *See id*. at 26. At the end of the hearing, the MHRO indicated his intent to certify that P.T. was in need of further inpatient treatment and evaluation. *See id*. at 30. On January 19, 2023, the MHRO entered a certification that P.T. was severely mentally disabled and in need of continued involuntary inpatient treatment pursuant to section 303.

P.T. petitioned the court of common pleas for review of the section 303 certification, and on January 20, 2023, the orphans' court conducted a review hearing. Neither party wished to present further evidence or testimony at the hearing. Accordingly, the orphans' court reviewed the videotape of the January 17, 2023 hearing and permitted additional argument by counsel for both parties. At the conclusion of the hearing, the orphans' court denied the petition for review of the section 303 certification and, on January 23, 2023, entered an order reflecting its determination. P.T. filed a timely notice of appeal, and both he and the orphans' court complied with Pa.R.A.P. 1925.[2]

P.T. raises the following issue for our review:

> Should the [section 303] extension-of-commitment orders entered on January 1[9] and 2[3], 2023, in . . . P.T.'s case be vacated, given the absence of any evidence establishing that the threats of suicide said to have been made by [P.T.] to his brother were both (a) fresh threats (in that they were made no more than

---

[2] The orphans' court ordered P.T. to file a concise statement pursuant to Rule 1925(b); however, P.T. failed to do so. Accordingly, the orphans' court submitted a Rule 1925(a) opinion in which it deemed all issues waived. This Court subsequently granted P.T.'s motion to file a concise statement *nunc pro tunc*, and after he did so, the orphans' court authored a supplemental Rule 1925(a) opinion addressing P.T.'s issues.

30 days before he was ordered committed by Dr. . . . Blaes on January 14, 2023), and (b) serious threats (in that [P.T.] had undertaken acts in furtherance of his threat to slit his own throat)?

P.T.'s Brief at 3.[3]

The MHPA provides for involuntary emergency examination and treatment of persons who are "severally mentally disabled and in need of immediate treatment." 50 P.S. § 7301(a). It then authorizes increasingly long periods of commitment for such persons, balanced by increasing due process protections in recognition of the significant deprivations of liberty at stake. *See In re S.M.*, 176 A.3d 927, 930 (Pa. Super. 2017). Our standard of review for an involuntary commitment order under the MHPA is to "determine whether there is evidence in the record to justify the court's findings." *Id*. at 935. "Although we must accept the trial court's findings of fact that have support in the record, we are not bound by its legal conclusions from those facts." *Id*.

Pursuant to section 301(a):

---

[3] Although P.T.'s extended confinement under section 303 has since expired, we nonetheless determine that his challenge is not moot. *See In re S.L.W.*, 698 A.2d 90, 92 (Pa. Super. 1997). Despite the fact that MHPA matters frequently appear moot due to the lapse of time between an involuntary commitment and appellate disposition, our courts consistently have held that a live controversy exists in these cases. *See id*. We recognize that an important liberty interest is at stake in all involuntary commitments and by their nature, most commitment orders expire prior to appellate review. *See id*. Since a finding of mootness would allow such claims to go unchallenged in most, if not all, cases, we continue to hear these matters and, where the facts allow, we have authority to vacate a commitment order and direct that the record be expunged. *See id*.

A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 P.S. § 7301(a). Section 301(b)(2) defines "clear and present danger" in relation to oneself, in relevant part, as follows:

Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide[.]

*Id*. § 7301(b)(2)(i), (ii).

Our Supreme Court has stated that "when involuntary commitment under the MHPA is based on the 'threat and act' formulation, both threat and act in furtherance must be proven." *In re B.W.*, 250 A.3d 1163, 1173 (Pa. 2021). However, a person's "articulation of a specific plan to harm an identified target that is deemed credible by medical professionals is sufficient to prove an act in furtherance of the threat to commit harm." *Id*. at 1175.

Section 302 provides for emergency examination of persons, which may be undertaken at a treatment facility upon, *inter alia*, the certification of a physician stating the need for such examination. ***See*** 50 P.S. § 7302(a). A physician must examine the person within two hours of arrival to determine if the person is severely mentally disabled within the meaning of section 301 and in need of immediate treatment. ***See id***. § 7302(b). If the physician so finds, then treatment shall begin immediately. ***See id***. Section 302 allows a person to be committed up to 120 hours. ***See id***. § 7302(d).

When a treatment facility determines that the need for emergency treatment is likely to extend beyond 120 hours, section 303 provides that the facility may apply to have that involuntary commitment extended up to twenty days. ***See id***. § 7303(a), (h). The facility files an application for such commitment with the court of common pleas, which then appoints an attorney for the person unless it appears that the person can afford, and desires to have, private representation. ***See id***. § 7303(b). Within twenty-four hours after the application is filed, an informal hearing shall be conducted by a judge or MHRO. ***See id***. Where the judge or MHRO determines that extended involuntary emergency treatment is necessary, a certification shall be filed with the director of the facility and a copy served on the person, such other parties as the person requested to be notified pursuant to section 302(c), and on counsel. ***See id***. § 7303(d)(1), (e).

Should an MHRO certify that an extended section 303 commitment is appropriate, the committed person may "petition to the court of common pleas for review of the certification." *See id*. § 7303(g). The court must hold a hearing "within 72 hours after the petition is filed unless a continuance is requested by the person's counsel." *Id*. "The hearing shall include a review of the certification and such evidence as the court may receive or require." *Id*. "If the court determines that further involuntary treatment is necessary and that the procedures prescribed by the [MHPA] have been followed, it shall deny the petition." *Id*.

P.T. concedes that the evidence established that he was severely mentally disabled. However, he challenges the evidence supporting the court's finding that he presented a danger to himself so as to require continued involuntary treatment. Initially, P.T. asserts that the Commonwealth failed to meet the requirements of subsection 301(b)(2)(ii) by establishing that his threat of suicide was both fresh and serious. P.T. points out that no testimony was presented regarding the date on which the telephone conversation with his brother occurred or whether it occurred within the thirty-day period prior to the facility's application to extend his involuntary emergency treatment. P.T. additionally argues that the Commonwealth failed to present evidence that he had taken any action in furtherance of his suicide threat. P.T. claims that he did not articulate a "***specific plan***" to kill himself and instead merely stated "***if*** he could find a ***long knife***, he would go under a bridge and slit his

- 11 -

throat." P.T.'s Brief at 24 (emphasis in original). P.T. argues that he did not say that he possessed a long knife or indicate how long a knife he needed in order to kill himself, nor did he state when he intended to slit his throat with such a knife. P.T. characterizes his statement to his brother as an off-hand, undated, stale, unfocused, unserious threat, which was nothing more than "idle talk, an expression of sadness." *Id*. at 24-25.

P.T. additionally asserts that the Commonwealth failed to meet the requirements of subsection 301(b)(2)(i) by establishing that he presented a danger to himself by acting in a manner which evidenced that he would be unable to satisfy his need for safety, and that there was a reasonable probability that death or serious bodily injury would ensue within thirty days absent his involuntary commitment. P.T. initially indicates his belief that subsection 301(b)(2)(i) "seems inapplicable to attempted suicide and threats of suicide cases." *Id*. at 26. Nonetheless, P.T. argues that, if subsection 301(b)(2)(i) applies to threats of suicide, the evidence presented did not establish a reasonable probability that death or serious bodily injury would occur within thirty days if he were not committed because there was no testimony that he had uttered a fresh threat to kill himself or taken any steps to effectuate that threat.

The orphans' court considered P.T.'s issue and determined that it lacked merit because there was ample evidence provided during the hearing which showed that P.T. represented a clear and present danger to himself under

sections 7301(b)(2)(i) and (ii) of the MHPA. *See* Trial Court Opinion, 8/29/23, at 7-8. The court reasoned as follows:

> The evidence shows [that subsection 301(b)(2)(ii)] was satisfied. The second medical doctor, [Dr. Dodd,] told the [MHRO] that she had personal interaction with [P.T.] within the past 5 days and is "deathly afraid that [P.T.] will go and kill himself, especially because right now he seems to be very cool, calm and collected, which is the most scary thing for a psychiatrist to see." A few sentences later, she told the [MHRO] that if [P.T.] is released, "he would likely kill himself if he walks out right now." This conclusion, as real as it is, and as frightening as it can be upon just reading the printed word, is supported by evidence. [P.T.] conveyed how he would go about ending his life (long knife, under a bridge, slit throat). This was coupled with [his] expressions of wanting to leave the facility. This information shows a plan of action. The coalescence of the information reflected in the medical records and filtered through both doctors['] medical training supports this court's conclusion to affirm the ruling of the [MHRO] to keep [P.T.] committed for an additional twenty (20) days.
>
> * * * *
>
> The evidence [also] shows [that subsection 301(b)(2)(i)] was satisfied through evidence presented before the [MHRO]. [P.T.] suffers from several ailments: severe depressive disorder, PTSD and opioid use disorder. The coalescence of these ailments, along with other evidence, contributed to the doctor's opinion that [P.T.] suffers from "severe mental illness[."] That "other evidence" includes [P.T.'s] statements to his brother. His statements were revealed in the medical records. His comments about suicide "demonstrated . . . that [he] was unable to meet [his] needs for 'self-protection and safety[.'"]

Trial Court Opinion, 8/29/23, at 8-9 (citations and unnecessary capitalization omitted).

After review, we conclude that the orphans' court's decision to extend P.T.'s involuntary commitment is adequately supported by the evidentiary record. With respect to subsection 301(b)(2)(ii), our Supreme Court has

- 13 -

explained that the articulation of a specific plan to harm oneself that is deemed credible by medical professionals is sufficient to prove an act in furtherance of the threat to commit harm. *See In re. B.W.*, 250 A.3d at 1175-76 (stating that "it is clear that engaging in the planning process by . . . expressing a detailed plan constitutes acts in furtherance of a threat under the MPHA"); *see also Appeal of H.D.*, 698 A.2d 90, 94 n.4 (Pa. Super. 1997) (holding that a plan to jump off a bridge was an act in furtherance).

Here, the record shows that P.T. made an articulable and specific plan to harm himself when he told his brother, John, that "if he could find a long knife, he would go under a bridge and slit his throat and die." N.T., 1/17/23, at 11. This is especially clear in view of the context of the threat, whereby P.T. was described by his brother John as being "very distraught and in a dark place," and that P.T. had additionally indicated that he would write a letter to John that he could share with their mother after P.T. was gone. *Id*. John was so concerned about P.T.'s suicide threat that he felt it necessary to warn the VA about P.T.'s suicide threat, dark mental state, and the letter P.T. intended to write for John's use after his death.

Moreover, two physicians and a nurse who treated P.T. found his threats to be both credible and recent, and determined that he was in need of immediate treatment. When Dr. Blaes considered P.T.'s suicide threat with his sudden attempt to leave the VA's domiciliary and drug addiction program, she found the suicide threat to be so credible that she immediately initiated

- 14 -

commitment proceedings under section 302. Dr. Dodd similarly attributed credibility to P.T.'s suicide threat given her numerous attempts to discuss it with P.T., and her belief that P.T. would kill himself if he were released. *See id*. at 19. Accordingly, because we accord great deference to the judgment of medical professionals, and because these medical professionals deemed P.T.'s specific plan to harm himself both credible and recent, we necessarily determine that the articulation of this plan to his brother and his announcement to VA staff that he intended to leave the program constituted the requisite act in furtherance as required by subsection 301(b)(2)(ii). *See In re B.W.*, 250 A.3d at 1175-76 (concluding that the articulation of a specific plan to harm an identified target that is deemed credible by medical professionals is sufficient to prove an act in furtherance of the threat to commit harm). The fact that P.T. did not state that he possessed a long knife, indicate how long a knife he needed to kill himself, or state when he intended to slit his throat with such a knife is inconsequential. *See In re. S.O.*, 311 A.3d 1132, 1137 (Pa. Super. 2023) (concluding that the fact that appellant did not purchase or attempt to purchase a firearm was inconsequential to show an act in furtherance). Thus, we hold that P.T.'s sufficiency argument as it relates to subsection 301(b)(2)(ii) is without merit.

Having concluded that the evidence was sufficient to support the orphans' court's decision to extend P.T.'s involuntary commitment under subsection 301(b)(2)(ii), we need not address the orphans' court's decision to

extend P.T.'s involuntary commitment under subsection 301(b)(2)(i). Nevertheless, we deem the evidence presented regarding subsection 301(b)(2)(i) adequate. Based on P.T.'s articulation to his brother of a specific plan to kill himself, coupled with his indication that he would write a letter to John for him to share with their mother after P.T. was gone and his stated intention to immediately leave the facility, P.T. acted in a manner which evidenced that he would be unable to satisfy his need for self-protection and safety, and that there was a reasonable probability that his death or serious bodily injury would occur within thirty days unless his commitment was continued. *See* 50 P.S. § 7301(b)(2)(i). Moreover, as stated above, because medical professionals deemed P.T.'s specific plan to harm himself both credible and recent, we determine that the articulation of this plan to his brother and his announcement to VA staff that he intended to leave the program constituted the requisite act in furtherance as required by subsection 301(b)(2)(i). *See In re B.W.*, 250 A.3d at 1175.

For these reasons, we conclude that the record contains sufficient evidence to establish that P.T. was so severely mentally disabled that he was a clear and present danger to himself at the time of the VA hospital's application to extend his involuntary commitment. Thus, we affirm the order extending P.T.'s commitment pursuant to section 303.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

10/24/2024